UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL NO. *04-10365-GAO* |
| ) | |
| v.                      ) | VIOLATIONS: |
| ) | 18 U.S.C. § 1341 (Mail Fraud) |
| ) | 18 U.S.C. § 1343 (Wire Fraud) |
| ) | 15 U.S.C. § 78j(b) & 78ff (Securities Fraud) |
| STEVEN P. SABLE,        ) | 18 U.S.C. § 1957 (Monetary Transactions in |
| ) | Property Derived from Specified Unlawful |
| Defendant.          ) | Activity) |
| ) | 18 U.S.C. §§ 981, 982 (Forfeiture) |
| ) | 18 U.S.C. § 2 (Principal) |
| ) | |

## INDICTMENT

The Grand Jury charges that:

1.     At all times material to this Indictment, Defendant STEVEN P. SABLE

("SABLE") was an individual who resided in Massachusetts and California.

2.     At all times material to this Indictment, SABLE was a principal of two entities

with similar names, Diversified Options, LLC, an entity organized under the laws of Nevada

("DOL-Nevada") and Diversified Options, Ltd., an entity organized under the laws of Delaware

("DOL-Delaware").  At all times material to this Indictment, SABLE operated those businesses

in Boston, Massachusetts and Newport Beach, California.  In discussions with investors, SABLE

often spoke as if there were only one entity, "DOL," when, in fact, there were at least these two

entities.

## THE SCHEME TO DEFRAUD

### Overview

3.      From at least June 1999 through at least April 2002, SABLE engaged in a

fraudulent stock promotion scheme in which he sold to at least sixteen investors in excess of

$800,000 of "units" of DOL-Nevada based on false and fraudulent statements about DOL and its

business.  SABLE's precise conduct varied from investor to investor, but his basic scheme was to

tell prospective investors that DOL controlled very valuable electronic flow measuring

technology (called a "flow sensor"), that a lucrative deal for the sale of DOL and/or its

technology was imminent, and that shares (or "units") in DOL were available for purchase prior

to the close of the deal.  Often, SABLE promised rapid and huge returns to the investors.

4.      SABLE's various statements about DOL were false and fraudulent.  Although the

flow sensor was a real device developed by a professor at the University of Cincinnati (the

"University"), the flow sensor had not (and, to date, has not) reached commercial application.

Contrary to SABLE's representations to the investors, no deals for the sale of DOL or the

technology were imminent.  SABLE simply misappropriated the investor funds.  Upon receipt of

investment funds, SABLE would usually deposit the funds into his personal bank account or

transfer the funds to other accounts that he or his family members controlled.  He then used the

funds to finance a lavish personal lifestyle.

### The Flow Sensor Technology

5.      In or about 1996, SABLE contacted a professor at the University about a

technology that the professor had developed in the field of Micro-Electro Mechanical Systems

(or "MEMS").  This technology (called, a "flow sensor" or "flow chip") was a type of MEMS

2

technology that could be used to measure the flow of liquids and gases. At the time, the flow

sensor the professor had developed was a device that had not yet reached commercial

application. SABLE expressed an interest in marketing the device to various industries for

commercial application. In August 1997, SABLE, on behalf of DOL-Delaware (*not* DOL-

Nevada), entered into a license agreement for the flow sensor with the University. SABLE,

however, failed to comply with the terms of the license and the University terminated the license

in November 2000. The University notified SABLE that the termination had become final in a

letter sent to SABLE dated February 6, 2001.

### SABLE's Attempts to Market the Flow Sensor

6.      From 1997 through 2001, SABLE attempted to market the flow sensor to various

companies. In 1999, one company, IMI Cornelius, Inc. ("Cornelius") provided limited funding to

DOL to develop and/or test the flow sensor for potential commercial application. Cornelius did

not pursue a business relationship with DOL beyond the initial development and/or testing phase

for the flow sensor. During 2000 and 2001, SABLE contacted a Taiwanese company, Lucky

Group, about the flow sensor. These discussions, which were even more limited than the

discussions with Cornelius, did not even result in funding to perform preliminary testing of the

flow sensor. At no time, did either Cornelius or Lucky Group agree to acquire DOL or the flow

sensor.

### The Investors

7.      Although from 1999 through 2001 SABLE had been unsuccessful in marketing

the flow sensor, SABLE told prospective investors a very different story. Beginning at least in

1999, SABLE solicited investments in DOL by telling investors that DOL and the flow sensor

3

technology were about to be acquired. At times, SABLE would invoke the name Cornelius as

the prospective buyer. At other times, he would invoke the name Lucky Group. Sometimes he

would identify other companies. Sometimes he would not disclose the name of the buyer. At all

times, SABLE claimed that an acquisition was either imminent or had closed (with just

formalities remaining), promising huge returns for investors who invested in time. In some

cases, once he had received funds from an investor, he would seek (and obtain) follow-on

investments by making additional misrepresentations as to the status of the (fictional)

acquisition. He even sought, and received, investments in DOL *after* the University had

terminated the license for the flow sensor technology.

### Jay C. and Kevin C.

8.    Two of the investors SABLE defrauded were Jay C. and Kevin C. Jay C.

invested approximately $210,000; Kevin C. invested approximately $102,500. Jay C. and Kevin

C. are business acquaintances. Jay C., a resident of Rhode Island, runs various businesses in

Rhode Island. Kevin C., also a resident of Rhode Island, is an accountant who provided

accounting services for Jay C.'s various businesses.

9.    Jay C. and Kevin C. met SABLE sometime in 1999, when Jay C. hired SABLE as

a consultant for one of Jay C.'s businesses. In or about mid-1999, SABLE approached Kevin C.

and Jay C. and offered them an investment in DOL. SABLE said that he owned a company

(DOL) that made a device that measured gas and liquid (i.e., the flow sensor). SABLE also

falsely told Kevin C. and Jay C. that he had a deal with Cornelius for sale of the flow sensor

technology. SABLE further falsely represented that the Cornelius deal was essentially complete

and was expected to close in the second or third quarter of 1999.

4

10.    In or about June 1999, Jay C. and Kevin C. agreed to invest in DOL. On or about June 14, 1999, SABLE issued certificates to Jay C. and Kevin C. for units in DOL-Nevada (not DOL-Delaware, which had licensed the technology). Jay C. then paid $210,000 (in three installments) to SABLE for the shares. Kevin C., who was unable to pay immediately, eventually paid $102,500 to SABLE. Once SABLE received the funds, he spent them on personal expenses.

11.    After they had provided the funds to SABLE, Jay C. and Kevin C. began asking SABLE about the status of the deal with Cornelius, which, based on SABLE's representations, they had been led to believe would close within months of their investment. SABLE then made a series of false statements both assuring them the deal was in process and providing excuses as to why the deal with Cornelius had not closed. These included false claims SABLE made in e-mails that Cornelius' parent company (based in the United Kingdom) had asked him to relocate to the United Kingdom.

12.    Throughout 2001 and into 2002, SABLE continued to provide false excuses as to why Kevin C. and Jay C. had not received the promised returns. At some point, SABLE told Kevin C. that a Taiwanese company would be acquiring DOL. Eventually, SABLE ceased providing excuses for why the deal had not closed and, in February 2002, sent an e-mail to Kevin C. falsely informing him that the DOL deal had, in fact, closed: "we managed to close despite all else." This time, however, SABLE falsely stated that the hold up was paperwork: "[t]he paperwork mill is slowly communicating all the necessary documents to all participants." There was, in fact, no closing and no paperwork being processed. SABLE made these statements to conceal from Jay C. and Kevin C. that he had defrauded them.

5

13.     To date, Jay C. and Kevin C. have not received return of their funds.

**Jennifer B., Jonathan B., Jeffrey B. and James B.**

14.     SABLE also defrauded Jennifer B. and three of her brothers, Jonathan B., Jeffrey B. and James B., (collectively the "B's"). SABLE fraudulently induced the B's into making a series of investments in DOL from April 2000 through August 2001 that totaled approximately $105,000.

15.     Jennifer is a resident of Massachusetts. She is a chiropractor. Jennifer met SABLE's wife Nancy in or about 1998, when Nancy became a patient of hers. Eventually, SABLE himself became a patient. Over time, Jennifer became friendly with SABLE and Nancy.

16.     In or about March 2000, SABLE contacted Jennifer at her home. SABLE told Jennifer that he owned a company, DOL. He then falsely told her that he had received an offer to sell DOL to a Taiwanese company called the Lucky Group. He then offered her an opportunity to invest, and Jennifer agreed to do so. On or about April 3, 2000, Jennifer gave SABLE a check for $10,000. SABLE then provided her a stock certificate for 200 units in DOL-Nevada (not DOL-Delaware) for the "value of $10,000 ($50.00 per unit)."

17.     In June 2000, SABLE fraudulently induced Jennifer (and her brother Jonathan) to make a further investment in DOL by claiming, falsely, that a new buyer had appeared. Specifically, on or about June 19, 2000, SABLE sent an e-mail to Jennifer stating, falsely, that a "second suitor has arrived on the scene"; that it had "proposed" a return of 100% of investors' original investment upon closing and a "pro rata" distribution of "profits for 5 years"; and that based on the "projections," Jennifer's original $10,000 investment was now valued at in excess of $400,000, with "closing . . . in as short as 90 days." After Jennifer responded that it was

6

"exciting news," SABLE offered Jennifer 500 additional shares because one investor had "died." Jennifer then asked for SABLE to reserve 250 units in her name and 250 units for her brother, Jonathan. On June 22, 2000, Jennifer wired $25,000 from her account at the Bank of Boston in Massachusetts to SABLE's account at Chase Manhattan Bank ("Chase") in New York. Sable then delivered to Jennifer certificates in DOL-Nevada.

18.    In November 2000, SABLE fraudulently induced Jennifer (and her brothers Jonathan, Jeffrey and James) to make an additional investment in DOL. On November 9, 2000, SABLE sent an e-mail to Jennifer stating, falsely, that the original projected numbers had been too low and that the "acquiring company" was of the "opinion" that the "marketshare is too conservative." SABLE then claimed that he had "discovered" 2500 "Founder's units" from the "estate of the deceased investor" that had to be "sold/returned" because of the investor's "internal affairs." Jennifer then sent an e-mail expressing her (and her brothers') interest in purchasing the units. On or about November 12, 2000, SABLE e-mailed Jennifer pressing her to invest, falsely stressing the imminence of the (fictitious) transaction by stating "[t]ime and other interest is heating the matter to a boil."

19.    On November 12, 2000, Jennifer notified SABLE that she and her brothers would invest an additional $54,500. On November 14, 2000, Jennifer wired $30,500 to SABLE's Chase account in New York. On or about November 20, 2000, a $4,000 check was sent to SABLE, which he deposited in his Chase account. On or about December 5, 2000, Jonathan wired $20,000 to SABLE's Chase account. Sable then delivered certificates in DOL-Nevada, mailing the certificates to Jennifer on or about December 13, 2000.

20.     In May 2001, SABLE fraudulently induced Jennifer to make yet another investment in DOL. In May 2001, SABLE e-mailed Jennifer, providing a false excuse as to why the deal had not yet closed and then falsely stating that a new date for the "closing" had been set for "the first week of June." This date, according to SABLE was "cast in stone." SABLE went on to state:

> The time leading up to the closing activities has been effectively used to complete the behind-the-scenes tedium of crossing the "T's" and dotting the "I's". During the now complete process of preparing all the documents for signature, the purchaser (Lucky Group) discovered that the equity balance (issued versus non-issued Units) was off owing to a reserve block of Units set aside for administrative purposes.

These statements were false and materially misleading. Among other things, there were no "closing activities" under way with Lucky Group; there was no "now complete process" of preparing documents "for signature"; and Lucky Group had not "discovered" that the "equity balance" was "off." Not only were these statements affirmatively false, but SABLE also did not inform Jennifer that, by this time, the University had terminated DOL-Delaware's rights to the flow sensor.

21.     SABLE then offered the "reserve block of Units" to Jennifer, and she agreed to purchase additional shares. On May 15, 2001, Jennifer and Jonathan invested $15,000. On or about this same date, SABLE mailed certificates in DOL-Nevada to Jennifer and Jonathan. Later, in August 2001, Jeffrey sent an additional $1,000 to SABLE.

22.     Following Jennifer's investment in May 2001, SABLE continued to provide Jennifer with false information about the status of the transaction and the reasons it had either not closed or that the funds had not been released to her. Among other things, SABLE claimed that

8

there needed to be "ceremonial meetings" in Taiwan; that they needed a "culture consultant" for the closing in Taiwan; that the "ceremonial meetings" had been eliminated because of the September 11, 2001 terrorist attacks in New York and Washington, D.C.; that the deal would be complete in early February 2002; that a "new group" from New York was "pressing for a close" in early March 2002; and that the deal had closed and checks were being cut for distribution in April 2002. These statements were also false, and were made to conceal that SABLE had, in fact, defrauded the B's. To date, the B's have not received return of their funds.

### Patrick D.

23.    SABLE also defrauded Patrick D. Patrick D. made a series of investments in DOL beginning in December 1999 and ending December 2001. In total, Patrick D. invested approximately $220,000 in DOL.

24.    Patrick D. is a resident of Michigan. He owns and operates a jewelry store. Patrick D. met SABLE's wife, Nancy, in the 1980's through a national organization of Corvette owners. Nancy and Patrick D. became friendly and, eventually, Patrick D. met SABLE.

25.    In the Summer and Fall of 1999, SABLE solicited Patrick D. to invest in DOL. SABLE told Patrick D. that SABLE's company made a metering device that could record or track the flow of gas and liquids and that SABLE held patents on the technology. SABLE also told Patrick D. that the patents and/or the company was going to be sold, and that Patrick D. could buy "units." In or about December 1999, Patrick D. paid $70,000 to SABLE for 1400 units in DOL. On or about January 4, 2000, SABLE mailed a certificate for 1400 units in DOL-Nevada (not DOL-Delaware) to Patrick D.

9

26.     In or about June 2000, SABLE fraudulently induced Patrick D. to invest an additional $125,000 in DOL. On or about June 19, 2000, SABLE sent Patrick D. a letter and falsely claimed, among other things, that "the number of firms preparing offers for DOL has increased" and that the "packages under discussion" included "100% return" of the investors' investments "before closing" and "a pro rata distribution of earnings for 5 years after the sale." SABLE also stated: "As an illustration: your personal investment ($70,000) will be returned upon closing; in addition, you (sic) share in 5 years of earnings, is currently valued at: $2,902,585." There were, in fact, no "firms" preparing "offers." No "packages" were even "under discussion," let alone packages showing a $2.9 million return on a $70,000 investment.

27.     After further communications with Patrick D., including a June 30, 2000 letter in which SABLE assured Patrick D. of SABLE's "adequate confidence in the opportunity," Patrick D. invested $125,000. SABLE mailed the share certificates in DOL-Nevada to Patrick D.

28.     In May 2001, SABLE fraudulently induced Patrick D. to invest another $12,500. This time, SABLE sent an e-mail to Patrick D. similar to the e-mail SABLE sent to Jennifer in May 2001 that both falsely represented the status of the transaction with Lucky Group and failed to inform Patrick D. that the University had terminated the DOL-Delaware license for the flow sensor. On or about May 17, 2001, Patrick D. wired SABLE $12,500 for purchase of additional "units." SABLE then mailed Patrick D. a certificate for 500 units in DOL-Nevada.

29.     In July and August 2001, SABLE fraudulently induced Patrick D. to invest another $10,000. This time SABLE represented to Patrick D. that the deal had, in fact, closed. Specifically, SABLE sent an e-mail to Patrick D. falsely stating, "[w]e inked our agreements in LA on 22 July." In that same e-mail, SABLE falsely stated the need for a "ceremonial signing"

10

in Taiwan, "which is customary with firms from this culture." Stating that an additional 500

units that SABLE himself was prevented from owning had come back on the market, SABLE

offered them to Patrick D. On August 7, 2001, Patrick D. paid $10,000 to SABLE for 100 units.

On or about August 13, 2001, SABLE mailed Patrick D. a certificate for 100 shares ($100 per

unit) in DOL-Nevada.

30.    In December 2001, SABLE fraudulently induced Patrick D. to make another

$5,000 investment in DOL. This time, SABLE falsely told Patrick D. that "Wall Street heavy

weights" had "made an offer to purchase the DOL assets from us prior to the closing with Lucky

Groups in Taiwan." In that same e-mail SABLE offered additional units that had "sprung loose."

He further represented:

> In order for us to react to the offer, the Wall Street group put up a
> non-refundable deposit of $1 mm. Accordingly, we are able to
> GUARANTEE investments, past and future. The closing is set for
> 60 days from Dec. 3.

As with his other earlier representations to Patrick D., these claims of an additional purchase

group and a "closing" set for "60 days after Dec. 3" were false and materially misleading. In

response to this solicitation, Patrick D. supplied approximately $5,000 worth of jewelry (detailed

in ¶59 herein) to SABLE in exchange for units in DOL. Patrick D. did not receive a certificate

from SABLE for this purchase, however.

31.    To date, Patrick D. has not received return of his funds.

**Kenneth T.**

32.    SABLE also defrauded Kenneth T., a resident of Massachusetts. Kenneth T.

invested $50,000 in DOL. Kenneth T. was a waiter at a restaurant. SABLE dined in the

restaurant often and developed a relationship with Kenneth T. During 2000, SABLE approached

Kenneth T. about making an investment in DOL. SABLE told Kenneth T. that DOL had a

valuable metering technology. SABLE falsely told Kenneth T. that he was selling DOL to Lucky

Group and offered Kenneth T. an opportunity to invest. On or about December 12, 2000,

Kenneth T. agreed to invest $50,000. On or about December 14, 2000, Kenneth T. wired

$50,000 from Cambridge Savings Bank in Massachusetts to SABLE's Chase account in New

York. Kenneth T. received, via mail, a certificate for 500 units in DOL-Nevada at $100 per unit.

33.     Thereafter, and throughout 2001, SABLE made many of the same false statements

to Kenneth T. about the status of the DOL "sale" that he made to other investors. At first, he

made a series of false excuses as to why the deal had not yet closed. Eventually, he claimed the

funds would be returned, but made additional false excuses as to why that did not happen. To

date, Kenneth T. has not received return of his funds.

### Elizabeth M.

34.     SABLE also defrauded Elizabeth M., a resident of Massachusetts. Elizabeth M.

invested $25,000. Elizabeth M. owned a restaurant in Boston. SABLE often dined in the

restaurant and developed a relationship with Elizabeth M. During 2000, SABLE approached

Elizabeth M. about making an investment in DOL. SABLE told Elizabeth M. that DOL had a

valuable technology that measured liquid. SABLE falsely told Elizabeth M. that he was selling

DOL and the technology to a Taiwanese company and offered Elizabeth M. an opportunity to

invest. Elizabeth M. agreed to invest. On or about December 14, 2000, Elizabeth M. wired

$16,000 from Hyde Park Savings Bank ("Hyde Park Bank") in Massachusetts to SABLE's Chase

account in New York. Of that amount, $15,000 represented a purchase of shares for Elizabeth

12

M. and $1,000 represented a purchase for a sister of Elizabeth M. Following that investment, SABLE solicited an additional investment from Elizabeth M. On or about January 10, 2001, Elizabeth M. wired an additional $10,000 from Hyde Park Bank to SABLE's Chase account. This was a purchase Elizabeth M. made for her daughter, Catherine M. Elizabeth M. received, via mail, certificates for DOL-Nevada on or about December 12, 2000 and January 15, 2001. To date, Elizabeth M. has not received return of her funds.

### Vincent M.

35.     SABLE also defrauded Vincent M., a resident of Massachusetts. Vincent M. invested $50,000 in DOL. Vincent M. met SABLE in 1998 or 1999. Vincent M. lived in the same building as SABLE in Charlestown, Massachusetts. In the summer of 2000, SABLE called Vincent M. SABLE falsely told Vincent M. that a company in Taiwan (which SABLE eventually identified as "Lite-On") was going to buy DOL. SABLE falsely said that he had been meeting with the Taiwan people and that they were guaranteed to buy DOL. SABLE falsely said that Vincent M. would get his investment back by year end. On or about September 13, 2000, Vincent M. invested $50,000 in DOL. On or about September 27, 2000, SABLE mailed Vincent M. a certificate for units in DOL-Nevada.

36.     After making his investment, Vincent M. asked SABLE for the Lite-On documents. SABLE said they were not available and that he was not allowed to disclose them. SABLE stated that he could not say anything about the deal until it was closed. SABLE then provided a number of false excuses as to why the DOL sale had not gone through. Eventually, Vincent M. demanded his money be returned, and SABLE agreed to do so. SABLE, however,

13

never returned the funds, providing a variety of false excuses as to why the funds had not been returned to him. To date, Vincent M. has not received return of his funds.

### James M.

37.    SABLE also defrauded James M., a resident of Massachusetts. James M. invested $25,000 in DOL. In or about the mid-1990's James M. met SABLE while James M. was working as a chef at the Marketplace Café in Boston. SABLE was a customer. James M. and SABLE became friendly. In or about October 2000, SABLE induced James M. to make a $25,000 investment in DOL. As with other investors, SABLE told James M. that he owned a company, DOL, that made a flow-chip device that measured natural gas flow. Sable told James M. that there was a company in Taiwan that was going to buy the flow chip and manufacture it. SABLE told James M. that James M.'s initial investment would be returned within the year, with something like a 25% return on the investment. On October 5, 2000, James M. obtained a bank check for $25,000 from Fleet Bank, which was made payable to SABLE. The check was deposited into SABLE's bank account at Chase. James M. then received via the mail a certificate for units in DOL. As he did with other investors, SABLE then provided to James M. a number of excuses as to why James M. had not received the promised return of the investment. To date, James M. has not received return of his funds.

### Paul J., John J., Richard J., and Joseph M.

38.    SABLE also defrauded Paul J., John J., and Richard J. (collectively the "J's") and Joseph M. The J's invested $45,000 in DOL. Joseph M. invested $10,000. Joseph M. is SABLE's brother-in-law and Paul J.'s friend. In February or March 2001, SABLE approached Joseph M. and told him of an investment opportunity. SABLE also communicated with Paul J.

14

As with the other investors, SABLE falsely represented to them that a company called Lucky Group in Taiwan was buying DOL and that investors would receive 100% of the investment back "upon closing (approx. 90 days)." SABLE also failed to tell the J's and Joseph M. that the University had terminated the DOL-Delaware license for the flow sensor. On or about March 9, 2001, Paul J. invested $15,000 for units in DOL. On or about March 12, 2001, Joseph M. invested $10,000 in DOL. On or about March 19, 2001, John J. invested $5,000 in DOL. These payments are reflected on SABLE's Chase bank statements mailed to SABLE at a Boston, Massachusetts address.

39.     In July and August 2001, SABLE solicited Paul J. to make another investment in DOL. This time, SABLE falsely stated that the transaction had closed, stating, "[w]e inked our agreements in LA on 22 July." Later, SABLE falsely represented: "It is now a slam dunk as the deal has been initialed by all parties, with official signing in Taiwan. In the wagering community, this is called 'Past-posting' of a bet." On or about August 10, 2001, Paul J. invested an additional $5,000. On or about August 14, 2001, Paul's brother, Richard J., invested $20,000 in DOL.

40.     Following the August 2001 investments made by Paul and Richard J., SABLE continued to provide a series of false statements on the status of the transactions. These statements were intended to conceal from the J's and Joseph M. that they had been defrauded. To date, the J's and Joseph M. have not received return of their funds.

### Albert F.

41.     Another investor SABLE defrauded is Albert F., also a resident of Massachusetts. In or about July 2001, Albert F. invested $5,000 in return for 50 units of DOL-Nevada. Albert F.

15

met SABLE in the 1990's.  They became business acquaintances.  In or about 1998, Albert F.

visited SABLE at his offices at the Charlestown Navy Yard.  There, SABLE showed him a video

about DOL.  In or about July 2001, SABLE told Albert F. that shares in DOL had become

available for $100 per share.  SABLE promised a substantial return in a short period of time.  As

with other investors, SABLE falsely stated that DOL and its technologies were being purchased

by Lucky Group in Taiwan.  Albert F. decided to invest $5,000.  On or about, July 17, 2001,

Albert F. wired $5,000 from his account at Brockton Credit Union in Massachusetts to Sable's

Chase account in New York.  In or about July 2001, SABLE mailed Albert F. a stock certificate

for 50 shares in DOL-Nevada.  To date, Albert F. has not received return of his funds.

### SABLE's Transfer of Proceeds of His Fraudulent Scheme

42.    On at least two separate occasions, SABLE took possession of fraud proceeds by

causing them to be deposited into his personal bank account at Chase, Account No. 621-001516-

65.  These included the following:

| | | |
|---|---|---|
| 1. | $16,000 | Deposit of funds provided by Elizabeth M. for purchase of DOL units on December 14, 2000. |
| 2. | $50,000 | Deposit of funds provided by Kenneth T. for purchase of DOL units on December 14, 2000. |

43.    In the days immediately following these deposits, SABLE withdrew amounts in

excess of $10,000 knowing that the funds were proceeds of his fraudulent scheme.  Specifically,

he caused the following transfers to other accounts:

16

| 1. | $16,500 | Transfer of funds from Chase Account No. 621-001516-65 to Chase Account No. 621-5012840-65 in the name of Jennifer Sable on December 15, 2000. |
|----|---------|--------------------------------------------------------|
| 2. | $25,000 | Transfer of funds from Account No. 621-001516-65 to Prudential Securities, Inc. account no. 600230 in the name of SABLE on December 15, 2000. |

### SABLE'S Expenditures

44.    Although the investors' funds were meant to be invested in DOL, SABLE used the funds to finance a lavish personal lifestyle. SABLE lived in expensive apartments, regularly ate at expensive restaurants, and spent substantial sums on travel. For example, SABLE's financial records show that expenditures in just one of SABLE's personal accounts from December 21, 2000 through January 22, 2001 (around the time SABLE had received investments from the B's, Kenneth T. and Elizabeth M.) were in excess of $29,000. Among the expenditures were meals at Boston, Massachusetts restaurants such as Locke-Ober ($426.14) and Pigalle ($485.30), both on December 22, 2000. Records show charges the next day (December 23, 2000) at CIBO Restaurant in Boston ($316.50) and Pasta Pasta in Port Jeffers, New York ($331.45). Also among the expenditures in December 2000 and January 2001 were three Delta Airline tickets for in excess of $1,900 each and charges to various resorts in Hawaii, including charges at Marriott (approximately $7,000), Four Seasons (approximately $2,000) and Consolidated Resorts (approximately $5,500).

## COUNTS ONE THROUGH THIRTEEN
### Mail Fraud
### 18 U.S.C. § 1341

45.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-44 of this Indictment and further charges that:

46.    On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant STEVEN P. SABLE having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises concerning material facts and matters, for the purpose of executing and attempting to do so, did take and receive matters and things sent and delivered by the United States Postal Service, and knowingly caused to be delivered by the United States Postal Service mail such matters and things, as follows:

| COUNT | DATE | MAILING |
|---|---|---|
| 1. | January 4, 2000 | Letter and certificate in DOL-Nevada sent from Massachusetts to Patrick D. in Michigan. |
| 2. | June 19, 2000 | Letter discussing status of investment in DOL sent from Massachusetts to Patrick D. in Michigan. |
| 3. | June 30, 2000 | Letter discussing possible investment in DOL sent from Massachusetts to Patrick D. in Michigan. |
| 4. | July 7, 2000 | Certificate in DOL-Nevada sent from Massachusetts to Patrick D. in Michigan. |
| 5. | September 27, 2000 | Certificate in DOL-Nevada sent from California to Vincent M. in Massachusetts. |
| 6. | November 10, 2000 | Certificate in DOL-Nevada sent to James M. in Massachusetts. |

18

| 7. | December 12, 2000 | Certificate in DOL-Nevada sent to Elizabeth M. in Massachusetts. |
| 8. | December 13, 2000 | Certificate in DOL-Nevada sent from California to Kenneth T. in Massachusetts. |
| 9. | December 13, 2000 | Certificate in DOL-Nevada sent to Jennifer B. in Massachusetts. |
| 10. | January 5, 2001 | Certificate in DOL-Nevada sent to Elizabeth M. in Massachusetts. |
| 11. | March 19, 2001 | Bank statement sent from Chase to Steven Sable and Nancy Sable, 20 Park Plaza, Suite 424, Boston, MA 02116 reflecting incoming funds transfers of $15,000 from Paul J., $10,000 from Joseph M., and $5,000 from John J. |
| 12. | May 15, 2001 | Certificate in DOL-Nevada sent to Jennifer B. in Massachusetts. |
| 13. | July 17, 2000 | Certificate in DOL-Nevada sent to Albert F. in Massachusetts. |

All in violation of 18 U.S.C. §§ 1341 and 2.

## COUNTS FOURTEEN THROUGH EIGHTEEN
### Wire Fraud
### 18 U.S.C. § 1343

47.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-44 of this Indictment and further charges that:

48.    On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant STEVEN P. SABLE having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises concerning material facts and matters, for the purpose of executing and attempting to do so, did take and receive matters and things sent and delivered via interstate wire communications such matters and things, as follows:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 14. | June 22, 2000 | Jennifer B. wire transfer of $25,000 from Bank of Boston, Boston, Massachusetts to SABLE account at Chase Manhattan Bank, New York, New York. |
| 15. | December 14, 2000 | Kenneth T. wire transfer of $50,000 from Cambridge Savings Bank, Cambridge Massachusetts to SABLE account at Chase Manhattan Bank, New York, New York. |
| 16. | December 14, 2000 | Elizabeth M. wire transfer of $16,000 from Hyde Park Savings Bank, Hyde Park, Massachusetts to SABLE account at Chase Manhattan Bank, New York, New York. |
| 17. | January 10, 2001 | Elizabeth M. wire transfer of $10,000 from Hyde Park Savings Bank, Hyde Park, Massachusetts to SABLE account at Chase Manhattan Bank, New York, New York. |

18.    July 17, 2001    Albert F. wire transfer of $5,000 from Brockton Credit Union, Brockton, Massachusetts to SABLE account at Chase Manhattan Bank, New York, New York.

All in violation of 18 U.S.C. §§ 1343 and 2.

## COUNTS NINETEEN THROUGH THIRTY-FIVE
### Securities Fraud
### 15 U.S.C. §§ 78j(b) & 78ff

49.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-44 of this Indictment and further charges that:

50.    Units in DOL-Nevada are "securities" as that term is used in 15 U.S.C. § 78c(a)(10).

51.    At various dates in the District of Massachusetts and elsewhere, STEVEN P. SABLE, defendant herein, did knowingly and willfully, by the use of means and instrumentalities of interstate commerce and of the mails, directly or indirectly (a) employed a device, scheme and artifice to defraud, (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices and courses of business which operated as a fraud and deceit upon persons, in connection with the purchase and sale of securities, including the purchase and sale of the following securities on or about the dates set forth below:

| COUNT | DATE | PURCHASE/SALE OF SECURITIES |
|---|---|---|
| 19. | April 3, 2000 | 200 Units in DOL-Nevada sold to Jennifer B. |
| 20. | June 21, 2000 | 250 Units in DOL-Nevada sold to Jennifer B. |
| 21. | November 12, 2000 | 400 Units in DOL-Nevada sold to Jennifer B. |
| 22. | May 15, 2001 | 280 Units in DOL-Nevada sold to Jennifer B. |

| 23. | June 21, 2000 | 250 Units in DOL-Nevada sold to Jonathan B. |
| 24. | November 12, 2000 | 400 Units in DOL-Nevada sold to Jonathan B. |
| 25. | May 15, 2001 | 20 Units in DOL-Nevada sold to Jonathan B. |
| 26. | November 12, 2000 | 200 Units in DOL-Nevada sold to James B. |
| 27. | November 12, 2000 | 90 Units in DOL-Nevada sold to Jeffrey B. |
| 28. | January 4, 2000 | 1,400 Units in DOL-Nevada sold to Patrick D. and Cynthia D. |
| 29. | July 7, 2000 | 2,500 Units in DOL-Nevada sold to Patrick and Cynthia D. |
| 30. | December 12, 2000 | 500 Units in DOL-Nevada sold to Kenneth T. |
| 31. | December 12, 2000 | 150 Units in DOL-Nevada sold to Elizabeth M. |
| 32. | January 15, 2001 | 100 Units in DOL-Nevada sold to Elizabeth M. for Catherine M. |
| 33. | September 13, 2000 | $50,000 for Units in DOL-Nevada sold to Vincent M. |
| 34. | October 5, 2000 | 250 Units in DOL-Nevada sold to James M. |
| 35. | July 17, 2001 | 50 Units in DOL-Nevada sold to Albert F. |

All in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2.

## COUNTS THIRTY-SIX AND THIRTY-SEVEN
### Monetary Transactions Property Derived From
### Specified Unlawful Activity
### 18 U.S.C. § 1957

52.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-44 of this

Indictment and further charges that:

53.     At various dates in the District of Massachusetts and elsewhere, STEVEN P.

SABLE, defendant herein, did knowingly engage and attempted to engage in monetary

transactions in criminally derived property that were of a value greater than $10,000 and were

derived from specified unlawful activity (to wit, wire and mail fraud), including the following

transactions:

| COUNT | AMOUNT | TRANSACTIONS |
|---|---|---|
| 36. | $16,500 | Transfer of funds from Chase Account No. 621-001516-65 to Chase Account No. 621-5012840-65 in the name of Jennifer Sable on December 15, 2000. |
| 37. | $25,000 | Transfer of funds from Account No. 621-001516-65 to Prudential Securities, Inc. account no. 600230 in the name of SABLE on December 15, 2000. |

All in violation of 18 U.S.C. §§ 1957 and 2.

24

## NOTICE OF ADDITIONAL FACTORS

The Grand Jury further charges that:

54.    The offenses charged in Counts One through Thirty-Seven of the Indictment continued until at least April 2002.

55.    The fraudulent scheme alleged in each of Counts One through Thirty-Seven of this Indictment involved a loss of more than $800,000, as described in U.S.S.G. § 2B1.1(b)(1)(H-I).

56.    The fraudulent scheme alleged in each of Counts One through Thirty-Seven of this Indictment involved more than ten (10) victims, as described in U.S.S.G. § 2B1.1(b)(2)(A).

57.    The fraudulent scheme alleged in each of Counts One through Thirty-Seven included relocating to another jurisdiction to evade law enforcement or regulatory officials or otherwise used sophisticated means, as described in U.S.S.G. § 2B1.1(b)(8).

58.    The offenses described in each of Counts One through Thirty-Seven involved an abuse of a position of trust, as described in U.S.S.G. § 3B1.3.

## FORFEITURE ALLEGATIONS

## (18 U.S.C. § 981 and 28 U.S.C. § 2461(c) and 18 U.S.C. § 982)

THE GRAND JURY FURTHER CHARGES:

59.    As a result of the offenses in violation of 18 U.S.C. §§ 1341,1343 and 2 and 15

U.S.C. §§ 78(a) and 78ff charged in Counts One through Thirty-Five of this Indictment, the

defendant, STEVEN P. SABLE shall forfeit to the United States any property, real or personal,

that constitutes, or is derived from, proceeds traceable to the commission of the offenses,

including but not limited to:

a.    Approximately $845,000 paid to SABLE by at least sixteen investors in exchange for shares in DOL;

b.    One seven-inch, dual-tone, 14 karat gold bracelet, given to SABLE by Patrick D. in exchange for shares in DOL;

c.    One pair of 14 karat gold, .66 carat total weight diamond hoop earrings, given to SABLE by Patrick D. in exchange for shares in DOL;

d.    One pair of .75 carat total weight diamond stud earrings, given to SABLE by Patrick D. in exchange for shares in DOL;

e.    One pair of 14 karat gold, .50 carat total weight diamond hoop earrings, given to SABLE by Patrick D. in exchange for shares in DOL;

f.    One 14 karat yellow gold, eighteen-inch chain, given to SABLE by Patrick D. in exchange for shares in DOL;

g.    One 14 karat yellow gold, opal and diamond pendant, given to SABLE by Patrick D. in exchange for shares in DOL;

h.    One pair of 14 karat yellow gold, opal and diamond earrings, given to SABLE by Patrick D. in exchange for shares in DOL; and

i.    One 14 karat yellow gold, sixteen-inch chain, given to SABLE by Patrick D. in exchange for shares in DOL.

26

A TRUE BILL

*[signature]*

FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney
DISTRICT OF MASSACHUSETTS December 9, 2004
Returned into the District Court by the Grand Jurors and filed.

*[signature]*

DEPUTY CLERK

3:40
12/99 (MS)

28

%JS 45 (5/97) - (Revised USAO MA 1/15/04)

**Criminal Case Cover Sheet**                          **U.S. District Court - District of Massachusetts**

Place of Offense:  Massachusetts          Category No.  II              Investigating Agency  FBI/IRS

City    Boston                              Related Case Information:

County    Suffolk                          Superseding Ind./ Inf.   N/A              Case No.    N/A
                                           Same Defendant    N/A          New Defendant  N/A
                                           Magistrate Judge Case Number    N/A
                                           Search Warrant Case Number    N/A
                                           R 20/R 40 from District of

**Defendant Information:**

Defendant Name   Steven P. Sable                      Juvenile    ☐ Yes    ☒ No

Alias Name

Address    10092 Constitution Drive, Huntington Beach, California

Birth date (Year only):   1947   SSN (last 4 #):   4664  Sex  M  Race:   Caucasian     Nationality:  USA

**Defense Counsel if known:**                          Address:

**Bar Number:**

**U.S. Attorney Information:**

AUSA  Jack W. Pirozzolo                      Bar Number if applicable  564879

Interpreter:        ☐ Yes  ☒ No              List language and/or dialect:

Matter to be SEALED:        ☒ Yes    ☐ No

        ☒ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date:**

☐ Already in Federal Custody as                      in                                              .
☐ Already in State Custody                    ☐ Serving Sentence    ☐ Awaiting Trial
☐ On Pretrial Release:    Ordered by                      on

Charging Document:        ☐ Complaint        ☐ Information        ☒ Indictment

Total # of Counts:        ☐ Petty              ☐ Misdemeanor              ☒ Felony    54

**Continue on Page 2 for Entry of U.S.C. Citations**

☒      I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
       accurately set forth above.

Date:  12/9/04                Signature of AUSA:

JS 45  (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**    Steven P. Sable _____

**U.S.C. Citations**

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 1341 | Mail Fraud | 1-13 |
| Set 2 | 18 U.S.C. § 1343 | Wire Fraud | 14-18 |
| Set 3 | 15 U.S.C. § 78j(b), 78ff | Securities Fraud | 19-35 |
| Set 4 | 18 U.S.C. §1957 | Monetary Transactions in Criminal Property | 36-37 |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**   Forfeiture Allegation, 18 U.S.C. §§ 981, 982 & 28 U.S.C. § 2461 _____

js45.indictment.wpd - 1/15/04 (USAO-MA)