UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                           04-10365-GAO

STEVEN P. SABLE

MOTION TO REVOKE ORDER OF DETENTION

Defendant Steven P. Sable, by his attorney, moves pursuant to 18 U.S.C.§3145(b) that

this Court revoke the order of detention of the Central District of California.

INTRODUCTION:

On December 14, 2004, Mr. Sable was arrested "without incident" at 727 Yorktown

Avenue, Apartment 224, Huntington Beach, California on a warrant issued in connection with

the above indictment.  As noted in the FBI 302, Nancy Sable, Mr. Sable's wife, was present in

the apartment at the time of arrest.  Mr. Sable informed the arresting FBI agents of his medical

condition which included medications for diabetes and cardiac illness. [Exhibit 1, FBI 302

12/14/04].

On December 15, 2005, Mr. Sable appeared before Magistrate Judge Marc L. Goldman

in United States District Court, Central District of California, Southern Division (Santa Ana,

California).  Mr. Sable was represented by Robert Carlin, Deputy Federal Public Defender.  At

that time, Mr. Sable waived his right to an identity hearing. The Court did conduct a detention

hearing after which Mr. Sable was ordered detained "solely on the risk of flight". [See Exhibit 2,

Transcript of Hearing, 12/15/04]

On February 16, 2005, after removal from California to Massachusetts, Mr. Sable

appeared before Magistrate Judge Cohen who appointed undersigned counsel and continued Mr.

1

Sable's detention status without further hearing based on the prior order of detention in California.

Mr. Sable has been detained at Plymouth County Correctional Facility (PCCF).

In March, 2005, Sable was found unconscious in his cell at PCCF. Medical diagnosis since that time has determined that he has kidney failure and requires dialysis treatment three times per week.

On March 30, 2005, defense counsel traveled to PCCF to meet with Mr. Sable, but was unable to meet because Mr. Sable had been taken from PCCF to receive dialysis treatment at Jordan Hospital.

On April 4, 2005, as a result of a telephone conversation with the U.S. Marshal's Service, defense counsel filed "Defendant's Motion For Court Ordered Transfer to Federal Medical Center". Defense counsel filed this motion at the request of the Marshal Service and assuming it was in his client's best interests.

Thereafter, defense counsel met with Mr. Sable at PCCF. Mr. Sable informed counsel that he believed he was alive solely because of the treatment he was receiving from the medical personnel at Jordan Hospital and Gambo Health Clinic where he was receiving his dialysis treatment..

On April 8, 2005, defense counsel filed "Defendant's Emergency Motion For Review Of Order Of Detention And To Establish Conditions Of Release"

On April 10, 2005, defense counsel filed "Defendant's Amended Emergency Motion For Review Of Order Of Detention And To Establish Conditions Of Release".

During this time frame, defense counsel was actively engaged in Suffolk Superior Court

in the first degree murder trial of Commonwealth v. Vasquez, et al. The Vasquez trial

commenced on March 7, 2005 and concluded on April 22, 2005. The trial day began at 9:00

a.m. and concluded at 4:30 p.m.

On April 14, 2005 , at 4:30 p.m., the Court (Magistrate Judge Alexander) conducted what

defense counsel initially understood was to be a telephone conference regarding the pending

motions. Defense counsel was, in fact, engaged before the Suffolk Superior Court (but without

jury) when he received the call from Judge Alexander. During the telephone conversation, Judge

Alexander proceeded to conduct a hearing on the merits of the pending motions. Defense

counsel informed the Court that he had withdrawn "Defendant's Motion For Court Ordered

Transfer to Federal Medical Center" and "Defendant's Emergency Motion For Review Of Order

Of Detention And To Establish Conditions Of Release"; leaving only "Defendant's Amended

Emergency Motion For Review Of Order Of Detention And To Establish Conditions Of

Release" for decision.

The Magistrate Judge entered an order denying the motion.

Based on the history and record of prior proceedings, defense counsel submits that it is

appropriate for this Court to now review the prior order of detention and upon review to

conclude that there are a combination of conditions that will assure Mr. Sable's appearance at all

required proceedings.

RELEASE:

Mr. Sable proposes the following conditions of release:

1.       Maintain residence with his wife, Nancy Sable, at her apartment at 17172 Bolsa

         Chica Street, #43, Huntington Beach, California, 92649 (Exhibit 3, Affidavit of

3

Nancy Sable);

2.    Report by telephone to local pretrial services office;

3.    Restrict travel to the District of California and District of Massachusetts;

4.    Unsecured appearance bond (defendant is indigent and without funds to post a
      bond);

5.    Abide by standard conditions of pretrial release.

Mr. Sable entered federal detention with existing health and medical issues including
diabetes and a form of cardiac illness. During the period of detention at PCCF, Mr. Sable's
medical condition changed, and worsened. He did not receive a proper diet to treat and maintain
his diabetes, did not receive medications that had been prescribed for him, did not receive proper
monitoring or review of his medications. As a result of these and other factors, Mr. Sable lost
over 40 pounds between January 19 and mid March, 2005.

In mid March, Mr. Sable was found unconscious in his cell. He was taken to Jordan
Hospital and remained in patient for approximately seven days. Mr. Sable has been informed,
and therefore believes, that his condition resulted from his being given high doses of certain
medications at a time when his blood chemistry did not require the medication causing him to
experience kidney failure.

Mr. Sable has now been diagnosed with End Stage Renal Disease (ESRD). This
diagnosis has been reported to the U.S. Marshals Service and is noted in an April 29, 2005
memo. (Exhibit 4)

Mr. Sable now requires dialysis treatment three times per week, four hours per treatment.
Dialysis treatment is provided at Gambro Health Care facililty, Plymouth, Massachusetts.

Mr. Sable has been informed that if he does not receive this dialysis treatment, he will die within seven days.

Additionally, Mr. Sable receives ongoing medical treatment at Jordan Hospital.

Since mid March, 2005, Mr. Sable has had two invasive surgical procedures installing two different catheter tubes.

Mr. Sable is awaiting results of a biopsy of his kidney which will, in part, determine what further surgeries will be required.

Since the onset of his medical treatments, Mr. Sable has been detained in the medical unit at PCCF. Mr. Sable relates that he is in de facto solitary confinement. He relates that he is in a room with glass walls, no television, no newspapers, few reading materials, no contact with other inmates or detainees. Moreover, the medical staff is both male and female, and that his toilet and showering is not conducted in privacy.

The initial order of detention was based solely on the grounds of risk of flight. The indictment is for mail fraud. Mr. Sable has no meaningful prior record.

Defense counsel submits that Mr. Sable's current medical condition and status, which did not exist at the time of his arrest and initial detention, is a marked change of circumstances militating against continued detention. It is beyond comprehension how a man who now requires dialysis treatment three times per week for four hours per session in order that he not die, presents a risk of flight for which conditions of pretrial release cannot be set.

The conditions of release proposed above are reasonable and adequate to assure his appearance at trial.

STEVEN P. SABLE
By his attorney,


/s/ Elliot M. Weinstein
Elliot M. Weinstein
BBO #520400
228 Lewis Wharf
Boston, MA 02110
617-367-9334

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/15/2004

On December 14, 2004, at approximately 6:30 AM, Steven Sable was located and arrested without incident at 727 Yorktown Ave, Apt. #224, Huntington Beach, CA 92646, pursuant to an arrest warrant issued out of the District of Massachusetts by Santa Ana FBI Agents for violation of Title 18, United States Code, Section 1341, 1343, and 1957-Mail, Wire and Securities Fraud, and Monetary Transactions in Property Derived from Specific Unlawful Activity, without incident. Also present at the residence during the arrest was Nancy Sable.

During the arrest, Sable notified arresting agents of preexisting medical problems and provided supporting documentation. This documentation was taken by arresting agents, and the U.S. Marshals service was provided with this documentation and briefed accordingly by SA Armstrong and SA Allen.

Following the arrest, Sable provided consent to search his residence and vehicle. The following items of evidence were recovered.

9 Floppy disk found in a paper bag removed from bedroom closet.

1 flyer titled "Foresight Technology Solutions" removed from beneath televisions stand in living room.

9 page presentation titled "Improved Competitive Advantage" removed from Southeast corner of livingroom.

2 floppy disk found in an enveloped taped to the south wall of the livingroom.

Subsequent to the arrest and search, Sable was transported to the Santa Ana FBI office by SA Brian Rielly and SA Ashley Garbutt in order to await opening of the Federal Building in Santa Ana.  SA Kevin Armstrong, SA Paul Allen, and SA Andy Lim transported Sable at 8;:45 AM to the U.S. Marshal's facility, 411 West Fourth St, Santa Ana, California.

---

Investigation on    12/14/2004    at  Huntington Beach, CA

File #

by  SA Kevin Armstrong, SA Brian Rielly, SA Paul Allen, SA Tom Brown    Date dictated  12/15/2004
    SA Grace Bongcaras, SA Ashley Garbutt, SA Jeff Palumbo,  SA A Lim

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____, On <u>12/14/2004</u>, Page __2__

Steven Sable is described as follows:

| | |
|---|---|
| Race | White |
| Sex | Male |
| Date of Birth | 05/15/1947 |
| Place of Birth | East Meadow, New York |
| SSAN | 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 |
| Height | 5'10" |
| Weight | 245 pounds |
| Hair color | Gray |
| Eye color | Hazel |
| Scars | 3 inch scar lower right neck; 4 inch scar on lower abdomen |
| FBI Number | 546077WB8 |

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
          PLAINTIFF,               )
                                   )
     VS.                           )    CASE NO. SA 04-551M
                                   )
                                   )
STEVEN PAUL SABLE,                 )
                                   )    SANTA ANA, CALIFORNIA
                                   )    DECEMBER 15, 2004
                                   )
          DEFENDANT.               )
_____)


DETENTION HEARING

BEFORE THE HONORABLE MARC L. GOLDMAN
UNITED STATES MAGISTRATE JUDGE

FOR THE PLAINTIFF:          DEBRA W. YANG
                            UNITED STATES ATTORNEY
                            STEVEN D. CLYMER
                            CHIEF, CRIMINAL DIVISION
                            ASSISTANT UNITED STATES ATTORNEY
                            BY:  BRETT SAGEL
                            ASSISTANT UNITED STATES ATTORNEY
                            411 WEST FOURTH STREET
                            SUITE 8000
                            SANTA ANA, CALIFORNIA  92701


FOR THE DEFENDANT:          MARIA E. STRATTON
                            FEDERAL PUBLIC DEFENDER
                            BY:  ROBERT CARLIN
                            DEPUTY FEDERAL PUBLIC DEFENDER
                            411 WEST FOURTH STREET
                            SUITE 7110
                            SANTA ANA, CALIFORNIA  92701


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

```
 1   APPEARANCES:   (CONTINUED)
     COURTROOM DEPUTY/          TERRI STEELE
 2   RECORDER:

 3   TRANSCRIBER:              DOROTHY BABYKIN
                              COURT HOUSE SERVICES
 4                            1218 VALEBROOK PLACE
                              GLENDORA, CALIFORNIA  91740
 5                            (626) 963-0566

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X
   CASE NO. SA 04-551M                    DECEMBER 15, 2004
2
   HEARING:   DETENTION HEARING.
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          SANTA ANA, CALIFORNIA; DECEMBER 15, 2004

2          THE COURT:  LET'S START OFF WITH CASE NUMBER

3    04-551M, UNITED STATES OF AMERICA VERSUS STEVEN PAUL SABLE.

4          MR. SAGEL:  GOOD AFTERNOON, YOUR HONOR.

5          BRETT SAGEL ON BEHALF OF THE GOVERNMENT.

6          MR. CARLIN:  YOUR HONOR, GOOD AFTERNOON.

7          ROBERT CARLIN APPEARING WITH MR. SABLE.  MR. SABLE

8    IS PRESENT BEFORE THE COURT.

9          THE COURT:  AND YOU ARE STEVEN R. SABLE?

10         THE DEFENDANT:  P. SABLE.

11         THE COURT:  STEVEN P. SABLE?

12         THE DEFENDANT:  RIGHT.

13         THE COURT:  OKAY.  MR. SABLE, YOU'RE BEFORE THE

14   COURT TODAY ON AN INDICTMENT AND WARRANT FROM THE DISTRICT OF

15   MASSACHUSETTS.  YOU WERE BROUGHT BEFORE JUDGE NAKAZATO

16   YESTERDAY; IS THAT RIGHT?

17         MR. CARLIN:  THAT IS CORRECT, YOUR HONOR.

18         THE COURT:  OKAY.  AND, MR. SABLE, JUDGE NAKAZATO

19   ADVISED YOU OF YOUR RIGHTS IN THIS MATTER.

20         THE DEFENDANT:  I DON'T --

21         MR. CARLIN:  THE RIGHTS WERE READ, YES, YOUR HONOR.

22         THE COURT:  HE USUALLY DOES, SO.

23         MR. CARLIN:  YES, YOUR HONOR.

24         THE COURT:  DO YOU REMEMBER THAT, MR. SABLE, OR

25   WOULD YOU LIKE ME TO GO THROUGH THEM WITH YOU AGAIN?

1          THE DEFENDANT:  I'M CONFUSED.  I THOUGHT YOU MEANT

2    MY MIRANDA RIGHTS.

3          THE COURT:  NO, NO.  JUST YOUR RIGHTS WITH RESPECT

4    TO APPEARANCE BEFORE THE COURT.

5          THE DEFENDANT:  YES.

6          THE COURT:  ALL RIGHT.  I ASSUME IT WAS EXPLAINED

7    TO YOU THAT YOU HAVE THE RIGHT TO WHAT'S CALLED AN IDENTITY

8    HEARING IN THIS COURT.

9          THE DEFENDANT:  RIGHT.

10         THE COURT:  YOU DON'T HAVE A RIGHT TO A TRIAL HERE.

11   IF YOU WANT A TRIAL, YOU NEED TO GO BACK TO THE DISTRICT OF

12   MASSACHUSETTS.

13         THE DEFENDANT:  MM-HMM.

14         THE COURT:  IF AFTER THAT IDENTITY HEARING I

15   DETERMINE THAT YOU WERE THE STEVEN R. SABLE NAMED IN THE

16   INDICTMENT FROM THE DISTRICT OF MASSACHUSETTS, I WILL ORDER

17   YOU SENT BACK.

18         DO YOU UNDERSTAND THAT?

19         THE DEFENDANT:  I DO.

20         THE COURT:  OKAY.

21         MR. CARLIN:  IT'S STEVEN P. SABLE.

22         THE COURT:  STEVEN P. SABLE.  OKAY.

23         AND I ASSUME YOU WERE ALSO INFORMED THAT YOU HAVE

24   THE RIGHT TO REQUEST THAT THIS MATTER BE TRANSFERRED TO THIS

25   DISTRICT FOR PURPOSES OF A GUILTY PLEA, BUT THE TRANSFER

1   WOULD ONLY TAKE PLACE IF YOU OBTAIN THE APPROVAL OF THE

2   UNITED STATES ATTORNEY FOR THIS DISTRICT AND THE UNITED

3   STATES ATTORNEY FOR THE DISTRICT OF MASSACHUSETTS AND IF YOU

4   AGREE TO PLEAD GUILTY.

5           DO YOU UNDERSTAND THAT?

6           THE DEFENDANT:  I DO.

7           THE COURT:  OKAY.  JUST SO I HAVE A COMPLETE

8   RECORD.  YOU HAVE RECEIVED A COPY OF THE INDICTMENT?

9           MR. CARLIN:  YES, YOUR HONOR.

10          THE COURT:  AND YOU'VE GONE OVER IT WITH MR. SABLE?

11          MR. CARLIN:  WE --

12          THE DEFENDANT:  I'VE ONLY HAD PERHAPS 10 MINUTES IN

13  COURT TO READ IT SINCE I GOT IT YESTERDAY.

14          THE COURT:  YOU DIDN'T HAVE IT IN YOUR CELL?

15          THE DEFENDANT:  THEY WOULDN'T GIVE IT TO ME.

16          THE COURT:  YOU NEED MORE TIME TO READ IT?

17          THE DEFENDANT:  I SCANNED IT AND I -- MOST OF

18  WHAT'S IN HERE IS NONSENSE AND EASILY ADDRESSED BY PROOF.

19          THE COURT:  OKAY.  WELL, TODAY'S NOT THE DAY FOR

20  THE TRIAL.

21          THE DEFENDANT:  I UNDERSTAND THAT.

22          THE COURT:  ALL RIGHT.  SO, MY QUESTION TO YOU IS

23  THIS, IF YOU WANT ADDITIONAL TIME TO READ IT COMPLETELY OR

24  TALK WITH YOUR LAWYER ABOUT IT, I'M GOING TO GIVE YOU THAT

25  TIME.  AND IF NOT, WE'LL PROCEED ON WITH THIS HEARING.  IT'S

1  UP TO YOU.

2          (MR. CARLIN CONFERRING BRIEFLY WITH CLIENT.)

3          MR. CARLIN:  WE'VE DISCUSSED THE CHARGES, YOUR

4  HONOR, THE STATUTORY CHARGES.  THE INDICTMENT IS LENGTHY.  I

5  THINK WE'RE READY TO PROCEED.  AND FOR THE RECORD, MR. SABLE

6  WAS ASKING WHETHER WE'RE GOING TO PROCEED WITH THE ISSUE OF

7  DETENTION OR BOND.  AND I TOLD HIM WE ARE.

8          THE COURT:  WELL, WE'LL GET TO THAT.

9          MR. CARLIN:  WELL, I UNDERSTAND, YOUR HONOR.

10          THE COURT:  YES, I JUST WANT TO KNOW IF HE WANTS TO

11  READ THE INDICTMENT.  WE'LL GET TO BOND LATER.

12          THE DEFENDANT:  NO, I'VE READ ENOUGH OF IT TO KNOW

13  THAT I'M CONFIDENT AGAINST -- THE DEFENSE AGAINST IT.

14          THE COURT:  ALL RIGHT.  WELL, I'M GLAD ABOUT THAT.

15  BUT ALL I NEED TO KNOW IS WHETHER YOU'VE READ IT AND YOU

16  UNDERSTAND WHAT THE CHARGES ARE, WHETHER YOU HAVE A DEFENSE

17  TO THEM OR NOT.

18          THE DEFENDANT:  ADEQUATELY, YES.

19          THE COURT:  ALL RIGHT.  VERY WELL.

20          I HAVE BEFORE ME WHAT'S CALLED A WAIVER OF RIGHTS

21  FORM SIGNED BY YOU AND WHAT APPEARS TO BE MR. CARLIN'S

22  SIGNATURE.

23          HAVE YOU GONE OVER THIS WITH MR. SABLE?

24          MR. CARLIN:  I HAVE, YOUR HONOR.  YESTERDAY.

25          THE COURT:  MR. SABLE, YOU REMEMBER SIGNING THE

1    WAIVER OF RIGHTS FORM?

2              THE DEFENDANT:  I DO.

3              THE COURT:  BY SIGNING THIS FORM, YOU'RE GIVING UP

4    YOUR RIGHT TO THE IDENTITY HEARING THAT WE TALKED ABOUT.  AND

5    I'M GOING TO ORDER THAT YOU GO BACK OR BE SENT BACK TO

6    MASSACHUSETTS TO FACE THE CHARGES AGAINST YOU.

7              YOU UNDERSTAND THAT?

8              THE DEFENDANT:  I DO.

9              THE COURT:  HAVE YOU SIGNED THIS FREELY AND

10   VOLUNTARILY?

11             THE DEFENDANT:  I HAVE.

12             THE COURT:  HAS ANYONE PROMISED YOU ANYTHING OR

13   THREATENED YOU IN ANY WAY IN ORDER TO GET YOU TO SIGN THIS?

14             THE DEFENDANT:  NO.

15             THE COURT:  ALL RIGHT.  THEN, I AM GOING TO APPROVE

16   THE WAIVER OF RIGHTS FORM.

17             ARE YOU THE STEVEN R. SABLE -- OR STEVEN P. SABLE,

18   RIGHT? -- AND STEVEN P. SABLE NAMED IN THE INDICTMENT?

19             THE DEFENDANT:  I AM.

20             THE COURT:  ALL RIGHT.  VERY GOOD.  THAT TAKES CARE

21   OF THAT PART.

22             YOU WERE APPOINTED YESTERDAY, MR. CARLIN?

23             MR. CARLIN:  I BELIEVE I WAS, YOUR HONOR.

24             THE COURT:  IF YOU WEREN'T, YOU ARE.

25             MR. CARLIN:  THANK YOU, YOUR HONOR.

1          THE COURT:  I WANT TO TAKE A QUICK LOOK AT THE

2    PRETRIAL SERVICES REPORT AGAIN.

3          (PAUSE IN PROCEEDINGS.)

4          THE COURT:  OKAY.  LET'S TAKE UP THE ISSUE OF BOND.

5          COUNSEL.

6          MR. SAGEL:  THE GOVERNMENT'S MOVING FOR DETENTION

7    BASED ON OUR MOTION THAT WE FILED YESTERDAY -- WHICH I HOPE

8    YOUR HONOR HAS BEFORE IT -- AS WELL AS THE GOVERNMENT WOULD

9    PROFFER THE PRETRIAL SERVICES REPORT AND THE BASES ON WHICH

10   THEY RELY.

11         FURTHERMORE, IF THE COURT HAS ANY SPECIFIC MATTERS

12   THAT THEY WANT THE GOVERNMENT TO ADDRESS, WE CAN.

13         BUT THE UNDERLYING FACTS IN HIS INDICTMENT ARE

14   BASICALLY THIS DEFENDANT ASKS PEOPLE FOR MONEY AND USES IT

15   FOR PERSONAL GAIN.  HE NEVER INVESTED THE MONEY.  LIED TO

16   THEM.  LIVED EXTRAVAGANTLY OFF OF THAT MONEY.

17         THE COURT:  HOW MUCH MONEY ARE WE TALKING ABOUT

18   HERE?

19         MR. SAGEL:  JUST IN WHAT HE WAS CHARGED WITH,

20   $800,000.  THE RELEVANT CONDUCT IN THE CASE IS WELL INTO THE

21   MILLIONS.

22         IN ADDITION, THAT'S NOT ALL THAT THIS DEFENDANT HAS

23   DONE.  HE'S COMMITTED TWO SEPARATE RELATED CRIMES WHILE HE'S

24   OUT HERE IN ORANGE COUNTY ALONE, I BELIEVE, WHICH ARE IN THE

25   PRETRIAL SERVICES REPORT.  BOTH A CONVICTION IN NEWPORT BEACH

1 | AND FOUNTAIN VALLEY.

2 | THE COURT:  NO PRIOR RECORD BEFORE 2002?

3 | MR. CARLIN::  NO, NONE, YOUR HONOR.

4 | THE COURT:  OKAY.

5 | MR. SAGEL:  THE OTHER VERY CONCERNING THING IS

6 | TWOFOLD BETWEEN THE DANGER TO THE COMMUNITY AND RISK OF

7 | FLIGHT.  THE GENTLEMAN -- AND I'M ASSUMING IT'S THE GENTLEMAN

8 | IN THE BACK, BUT THE GENTLEMAN WHO'S OFFERED TO POSSIBLY PUT

9 | UP A BOND FOR HIM HAS NOT KNOWN THE DEFENDANT VERY LONG.  I'M

10 | NOT SURE HE'S FAMILIAR WITH WHAT THE DEFENDANT HAS DONE WITH

11 | EVERYBODY ELSE'S MONEY AND HIS -- THE DEFENDANT'S LACK OF

12 | CONCERN FOR OTHER PEOPLE'S MONEY.

13 | THE COURT:  WELL, THAT'S HIS PROBLEM.

14 | MR. SAGEL:  OKAY.

15 | MR. CARLIN:  AND I SHOULD HASTEN TO ADD WHAT HE IS

16 | ALLEGED TO HAVE DONE SHOULD BE CORRECTED.

17 | THE COURT:  I UNDERSTAND THAT.

18 | GO AHEAD.

19 | MR. SAGEL:  AND, ALSO, BASED ON THE REPORTS AND THE

20 | FINANCIAL DISCLOSURES, ET CETERA, I'M NOT SURE HOW THE

21 | DEFENDANT WOULD BE ABLE TO GET -- FIND HIS WAY TO

22 | MASSACHUSETTS ANYWAY FINANCIALLY.  AND HE WOULD BE A RISK OF

23 | FLIGHT UNDER THOSE CIRCUMSTANCES AS WELL.

24 | IF YOU HAVE ANY OTHER SPECIFIC QUESTIONS, I CAN

25 | ADDRESS THOSE.  BUT I THINK BASED ON HIS CRIMINAL HISTORY AND

1    SO FORTH, HE'S BOTH A RISK OF FLIGHT AND A RISK TO THE

2    COMMUNITY.  AND HE SHOULD BE DETAINED PENDING HIS APPEARANCE

3    IN MASSACHUSETTS.

4              THE COURT;  MR. CARLIN.

5              MR. CARLIN:  YOUR HONOR, JUST A COUPLE OF COMMENTS

6    IN RESPONSE AS A PREFACE BEFORE I MOVE INTO MY PLANNED

7    TIRADE.

8              THE COURT -- AS THE COURT KNOWS, MR. KEATON, TO

9    WHOM REFERENCE WILL BE MADE, IS HERE BEFORE THE COURT.

10   THAT'S THE GENTLEMAN AT THE END ON THE LEFT.  NEXT TO HIM IS

11   MR. SABLE'S WIFE OF 36 YEARS.

12             I SPOKE YESTERDAY WITH THE ASSISTANT UNITED STATES

13   ATTORNEY HANDLING THE CASE IN MASSACHUSETTS.  AND WHEN I

14   ASKED HIM WHAT THE LOSS WAS, HE TOLD ME IT WAS $845,000.  I

15   DON'T KNOW OF ANY RELEVANT CONDUCT, BUT HE DIDN'T MENTION IT.

16             WITH RESPECT TO THE FACTS AND THE WEIGHT OF THE

17   EVIDENCE, THE ONLY COMMENT WE HAD -- OR STATEMENT WE HAD WITH

18   RESPECT TO THE WEIGHT OF THE EVIDENCE AT LEAST IS MR.

19   SABLE'S, BUT THAT, NONETHELESS, THE WEIGHT OF THE EVIDENCE IS

20   THE LEAST IMPORTANT FACTOR I THINK THE COURT NEED CONSIDER

21   WHEN DETERMINING WHETHER A BOND IS APPROPRIATE.

22             WITH RESPECT TO WHETHER OR NOT MR. SABLE CAN OR

23   CANNOT GET TO MASSACHUSETTS, I DON'T THINK THE GOVERNMENT'S

24   CONCERN FOR HIS FINANCIAL WELL-BEING AND WHEREWITHAL TO MAKE

25   IT TO MASSACHUSETTS IS SINCERE.  AND I THINK THAT HE WILL

1   MAKE IT TO MASSACHUSETTS IF HE NEEDS TO.

2           WE'VE REQUESTED A -- WITH RESPECT TO -- EXCUSE ME.

3           THE COURT:  WHAT IS THE PROBLEM.  LET'S TALK ABOUT

4   THE PROBLEM.  THE PROBLEM IS THE FAILURE TO APPEAR AND THE

5   FAILURE TO COMPLY WITH PROBATION.

6           MR. CARLIN:  AS I READ THE PRETRIAL SERVICES

7   REPORT, THERE WERE BENCH WARRANTS ISSUED, BUT I DON'T SEE

8   FAILURES TO APPEAR.

9           BUT I THINK THE COURT ASKED THE QUESTION WITH

10  RESPECT TO WHEN THE FIRST CONVICTIONS WERE.  THE FIRST

11  CONVICTIONS SUFFERED BOTH WERE IN 2002.  THE CONDUCT ALLEGED

12  IN THE INDICTMENT WAS FROM 1999 TO 2002.  SO, WHAT WE HAVE,

13  IT WOULD APPEAR, IS A SHORT BURST OF CONDUCT.  EVEN IF WE

14  VIEW IT IN THE LIGHT MOST -- A SHORT BURST OF CONDUCT WHICH

15  SEEMS TO HAVE BEEN ABERRATIONAL IN AN OTHERWISE DECENT LIFE.

16          MR. SABLE WAS 52 YEARS OLD, I GUESS, WHEN THE

17  CONDUCT ALLEGED IN THIS INDICTMENT OCCURRED, 55 WHEN THE

18  CONVICTIONS OCCURRED.

19          BUT SINCE 2002 --

20          THE COURT:  WHERE IS THE INDICTMENT FROM?

21          MR. CARLIN:  MASSACHUSETTS.

22          THE COURT:  I KNOW WHERE.  BUT --

23          MR. CARLIN:  1999 TO 2002.

24          THE COURT:  OKAY.

25          MR. CARLIN:  IS THE CONDUCT ALLEGED.  BUT THERE'S

1    NO CRIMINAL CONDUCT SINCE 2002.  SO, WE HAVE TWO CONVICTIONS

2    IN 2002, WHICH ARE REGRETTABLE.  HOWEVER, I'M NOT ATTEMPTING

3    TO CONDONE ANY CRIMINAL CONDUCT, BUT I THINK THE SENTENCES

4    SEEM TO SUGGEST, AT LEAST IN STATE COURT, THEY WEREN'T VIEWED

5    TO BE THE MOST SERIOUS OF OFFENSES.  THAT DOESN'T MEAN THAT

6    THEY'RE NOT TO BE CONSIDERED.

7             BUT DESPITE SOME PROBLEMS AND SOME FALSE STARTS, HE

8    HAS BEEN REPORTING TO HIS PROBATION OFFICER SINCE JUNE OF

9    THIS YEAR.  THERE ARE NO PENDING VIOLATIONS.

10            SO, I THINK UNDER THE CIRCUMSTANCES, YOUR HONOR,

11   THERE REALLY IS EVERY REASON TO BELIEVE THAT A COMBINATION OF

12   CONDITIONS CAN BE PUT TOGETHER TO REASONABLY ASSURE HIS

13   APPEARANCE.

14            ALSO, WITH RESPECT TO THE REQUEST FOR DETENTION, I

15   THINK THE BASES FOR THE REQUEST ARE INAPPROPRIATE.  I DON'T

16   THINK THE COURT CAN, GIVEN THE CASE LAW IN TWINE, CONSIDER

17   THE ISSUE OF DANGER.

18            WITH RESPECT TO THE ISSUE OF FLIGHT, THE GOVERNMENT

19   HAS NOT EVEN STATED IN ITS REQUEST FOR DETENTION THAT MR.

20   SABLE POSES A SERIOUS RISK OF FLIGHT.  AND I THINK THE COURT

21   BEFORE IT EVEN ENTERTAINS THE REQUEST FOR DETENTION WOULD

22   HAVE TO FIND THAT THERE'S A SERIOUS RISK OF FLIGHT.  THERE

23   MAY BE SOME RISK OF FLIGHT.  BUT I DON'T THINK WHAT THE

24   GOVERNMENT HAS OFFERED TO THE COURT CONSTITUTES A SERIOUS

25   RISK OF FLIGHT.  I MEAN, THERE'S ANY NUMBER OF CONDITIONS

1    THAT COULD BE TAILORED TO SECURE HIS APPEARANCE.  MR. SABLE

2    --

3            THE COURT:  LET ME UNDERSTAND HIS CRIMINAL HISTORY

4    FOR A MINUTE.  WE HAVE THESE TWO CONVICTIONS FROM 2002.

5    PLACED ON PROBATION.  PROBATION IS REVOKED IN APRIL OF 2003

6    -- THEN ARRESTED -- FOR ELEVEN MONTHS.

7            SO, WHERE WAS HE FOR THOSE ELEVEN MONTHS?

8            MR. CARLIN:  LOCAL.  APPARENTLY --

9            THE COURT:  WASN'T HE SUPPOSED TO BE REPORTING?

10           MR. CARLIN:  CORRECT.

11           THE COURT:  OKAY.

12           MR. CARLIN:  AND APPARENTLY HE WASN'T.  AND THERE'S

13   -- WE UNDERSTAND THAT'S A PROBLEM, BUT WE DON'T THINK IT'S

14   NECESSARY -- I MEAN, I THINK -- I GUESS IT'S WHETHER THE

15   GLASS IS HALF EMPTY OR HALF FULL.  SINCE JUNE OF THIS YEAR

16   HE'S BEEN REPORTING TO THE SAME PROBATION OFFICER.

17           I'M NOT GOING TO REPRESENT TO THE COURT THAT THE

18   PROBATION OFFICER WAS A HUNDRED PERCENT IN FAVOR OF MR.

19   SABLE'S PERFORMANCE ON PROBATION.  BECAUSE I THINK THAT AFTER

20   I SPOKE WITH HIM, HE SPOKE WITH PRETRIAL SERVICES.  BUT HE

21   DID SAY THAT MR. SABLE IS NOW COMPLIANT.  MR. SABLE IS

22   WORKING TOWARDS RESTITUTION.  MR. SABLE IS EMPLOYED.  HE'S

23   WORKING WITH MR. KEATON.

24           MR. KEATON IS WILLING TO SECURE THE BOND UP TO THE

25   AMOUNT OF $50,000.  AND I THINK THAT SAYS A LOT.  THEY MAY

1    HAVE ONLY BEEN WORKING TOGETHER FOR TWO MONTHS, BUT SECURITY

2    IS SECURITY.  AND THE FACT THAT MR. KEATON IS HERE TODAY

3    ILLUSTRATES THAT HE IS CONFIDENT THAT MR. SABLE WILL SHOW UP.

4          HE HAS DESCRIBED MR. SABLE AS DEPENDABLE, RELIABLE,

5    AND HE'S SATISFIED WITH HIS WORK.  MR. SABLE, ALSO, TO HIS

6    CREDIT, WAS HONEST ABOUT HIS BACKGROUND AND HIS PROBLEMS WITH

7    MR. KEATON BEFORE THEY STARTED WORKING --

8          THE COURT:  WELL, LET ME ASK YOU SOMETHING.  LET'S

9    ASSUME FOR A MINUTE THAT I SET A BOND AND I REQUIRE FULL

10   POSTING OF PROPERTY.  ALL RIGHT.  BY THAT TIME, HE'S PROBABLY

11   IN MASSACHUSETTS.  DOES IT MAKE MORE SENSE TO HAVE THE

12   AUTHORITIES IN MASSACHUSETTS REVIEW IT?

13         MR. CARLIN:  I THINK PROBABLY HE WOULDN'T BE IN

14   MASSACHUSETTS.

15         THE COURT:  HE'D BE SOMEWHERE IN --

16         MR. CARLIN:  WELL, I THINK IF THE COURT WOULD SET A

17   BOND, I THINK -- I WOULD HOPE THAT THE COURT COULD GIVE US SO

18   MANY DAYS OR A COUPLE OF WEEKS TO PERFECT THE BOND AND HAVE

19   HIM STAY IN LOCAL CUSTODY UNTIL THE BOND WAS PERFECTED.  AND

20   WE'LL DO EVERYTHING WE CAN TO GET IT DONE.

21         I COULD ALSO REQUEST OF THE COURT, ALTHOUGH I MAY

22   BE PUSHING MY LUCK, THAT HE BE RELEASED ON A BOND SIGNED BY

23   BOTH HIMSELF AND HIS WIFE PENDING PERFECTION OF THE BOND BY

24   MR. KEATON.

25         HE WAS ARRESTED AT HIS RESIDENCE.  THEY KNOW WHERE

1    HE LIVES.  HE HASN'T GONE ANYWHERE FOR SOME TWO YEARS.

2              THE COURT:  HE'S STAYING IN A MOTEL; IS THAT RIGHT?

3              MR. CARLIN:  YES, YOUR HONOR.  AND HE'S BEEN THERE

4    TWO YEARS I BELIEVE.  AND THAT'S WHERE THE AGENTS ARRESTED

5    HIM YESTERDAY.

6              THE COURT:  AND THE U.S. ATTORNEY'S OFFICE IN

7    MASSACHUSETTS REQUESTED DETENTION; IS THAT RIGHT, MR. SAGEL?

8              MR. SAGEL:  YES, YOUR HONOR.

9              JUST FOR THE RECORD, YOUR HONOR, PRIOR TO THE

10   PRESENTENCE REPORT TODAY, THE DISTRICT OF MASSACHUSETTS HAD

11   NO KNOWLEDGE OF HIM HAVING ACCESS TO ANY MONEY OTHER THAN

12   POSSIBLY ILL-GOTTEN GAINS OR HAVING NO MONEY, SO.

13             BUT I'M ASSUMING THEY WOULD STILL SEEK DETENTION

14   EVEN IN LIGHT OF THIS.

15             THE COURT:  ANYTHING ELSE?

16             MR. CARLIN:  WELL, SAFE TO SAY, YOUR HONOR, AS I

17   SAY, I THINK THE PERIOD OF THREE YEARS IS REGRETTABLE.  BUT

18   SINCE THEN HE'S STABILIZED.  HE'S WORKING.  I THINK HE'S

19   SHOWED IN THE COURSE OF THE 50 YEARS PRIOR THAT HE'S

20   RESPONSIBLE.  HIS WIFE OF 36 YEARS IS HERE TODAY.  SHE KNOWS

21   HIM PROBABLY BETTER THAN ANYBODY.  SHE BELIEVES THAT HE WILL

22   SHOW UP IN COURT AS REQUIRED.  SHE'S WILLING TO SIGN ON A

23   BOND, ALTHOUGH HER RESOURCES ARE LIMITED.

24             THERE ARE MEDICAL ISSUES THAT GIVE PAUSE FOR

25   THOUGHT WITH RESPECT TO HAVING HIM SHIPPED BACK TO

1   MASSACHUSETTS AND DOING THE COUNTY JAIL SHUFFLE.  HE'S

2   DIABETIC.  THERE WAS A SCRAMBLE YESTERDAY EVENING TO GET

3   MEDICAL ATTENTION AND PRESCRIPTION MEDICATIONS TO HIM.

4          I THINK UNDER THE CIRCUMSTANCES THE COURT'S

5   CONCERNS ARE UNDERSTANDABLE.  BUT I THINK ALSO THE ISSUE OF

6   WHETHER OR NOT HE'S A SERIOUS RISK OF FLIGHT HAS NOT BEEN

7   SATISFIED.

8          I CAN -- AS I WAS PREPARING FOR THIS MORNING'S --

9   FOR THIS AFTERNOON'S HEARING, I WAS READING A DISTRICT COURT

10  CASE OUT OF ARIZONA, AND I THINK THAT'S ILLUSTRATIVE.  IT'S A

11  CASE THAT INVOLVED A LEBANESE NATIONAL WHO HAD SIGNIFICANT

12  TIES TO LEBANON.  WAS INVOLVED IN A CASE THAT INVOLVED LOTS

13  OF MONEY, $11 MILLION.  A RECORDED TELEPHONE CONVERSATION IN

14  WHICH THAT PERSON SAID IF THE GOVERNMENT CAME AFTER HIM FOR

15  BACK TAXES, HE'D FLEE TO LEBANON.  AND THAT WAS NOT ENOUGH TO

16  RISE TO A SERIOUS RISK OF FLIGHT.  IF THOSE KINDS OF FACTS

17  AREN'T, I'M NOT SURE --

18          THE COURT:  WHO WAS THE JUDGE ON THAT?

19          MR. CARLIN:  I COULD GIVE IT TO YOUR HONOR.

20          BUT IF THOSE KINDS OF FACTS AREN'T SUFFICIENT TO

21  WARRANT A FINDING, I THINK THE --

22          THE COURT:  WELL, YOU KNOW, I MEAN, YOU NEVER KNOW

23  WHAT A JUDGE IS GOING TO DO IN A PARTICULAR CASE.

24          MR. CARLIN:  ANDERSON.  JUST IN CASE YOU BUMP INTO

25  HIM AT A CONFERENCE.  JUDGE ANDERSON WORKS IN --

1          (DEFENDANT SPEAKING TO MR. CARLIN.)

2          MR. CARLIN:  CAN I JUST TAKE A MOMENT WITH MR.

3    SABLE.

4          THE COURT:  SURE.

5          (MR. CARLIN CONFERRING WITH CLIENT.)

6          THE COURT:  YOU TALKED WITH THE PROBATION OFFICER?

7          MR. SAGEL:  YES, YOUR HONOR.

8          THE COURT:  ANY OTHER INFORMATION THAT YOU HAVE FOR

9    ME OTHER THAN THE UNSATISFACTORY NATURE OF THE PROBATION

10   STATUS FOR THAT YEAR?  APPEARS HE DIDN'T CHOOSE TO SHOW UP

11   FOR A YEAR.  JUDGE PUT HIM BACK ON PROBATION IT LOOKS LIKE.

12         BUT ANY OTHER INFORMATION THAT'S NOT IN THE REPORT

13   THAT YOU FEEL MIGHT BE PERTINENT FROM THE PROBATION OFFICER?

14         MR. SAGEL:  NO, YOUR HONOR.  I THINK I SUMMARIZED

15   OUR CONVERSATION IN THIS REPORT.

16         THE COURT:  OKAY.

17         ANYTHING ELSE FROM ANYONE?

18         MR. SAGEL:  I DON'T KNOW THAT IT'S --

19         UNIDENTIFIED SPEAKER:  CAN I SAY SOMETHING?

20         THE COURT:  NO.

21         MR. SAGEL:  I DON'T KNOW IF IT'S RELEVANT, YOUR

22   HONOR, BUT JUST TO CLARIFY THE RECORD.  ACCORDING TO WHAT THE

23   WIFE HAS TOLD, MOST OF THE INVESTORS WHICH THERE ARE E-MAILS

24   FOR, SHE'S IN THE PROCESS OF DIVORCING HIM.

25         ALSO, ACCORDING TO THE PROBATION OFFICER THAT HE'S

1  SEEING NOW, IF I'M CORRECT, AND I DON'T KNOW, HE'S REPORTING

2  DIFFERENT RESIDENCES.  SO, ACCORDING TO WHAT HE'S TELLING

3  BOTH THE COURT AND HIS INVESTORS, HE'S NOT -- HE HASN'T BEEN

4  MARRIED AND HASN'T BEEN LIVING WITH.  SO, I'M NOT EVEN SURE

5  THAT RELEASING HIM UNDER HER SIGNATURE IS VERY STABLE AS

6  WELL.

7          MR. CARLIN:  WELL, I THINK THE BEST PERSON TO ASK

8  WOULD BE MRS. SABLE.  SHE'S SITTING IN THE COURT.

9          THE COURT:  WELL, UNLESS YOU WANT TO PUT HER ON THE

10  STAND, I'M NOT JUST GOING TO SIT HERE AND ASK HER QUESTIONS.

11          MR. CARLIN:  I'LL PUT HER UP.  I'LL PUT HER ON FOR

12  A QUICK QUESTION TO CLARIFY THAT, YOUR HONOR.

13          THE COURT:  THAT'S FINE.  OBVIOUSLY, HE HAS A RIGHT

14  TO CROSS-EXAMINE.

15          MR. CARLIN:  I WOULD ASK THAT SHE BE ADVISED OF HER

16  RIGHTS.

17          THE COURT:  -- PLACED UNDER OATH.

18          MR. CARLIN:  RIGHT.

19          THE CLERK:  RIGHT YOUR RIGHT HAND.

20          NANCY SABLE, DEFENSE WITNESS, SWORN:

21          THE WITNESS:  YES.

22          THE CLERK:  PLEASE STATE YOUR TRUE NAME, FULL NAME

23  FOR THE RECORD.

24          THE WITNESS:  NANCY SABLE.

25          THE COURT:  ALL RIGHT.  MRS. SABLE, NOW THAT YOU'VE

1   BEEN PLACED UNDER OATH, I WANT TO ADVISE YOU THAT IF YOU MAKE

2   ANY FALSE STATEMENTS TO THE COURT --

3           THE WITNESS:  RIGHT.

4           THE COURT:  -- IN ANY MATTER THAT YOU'RE ASKED

5   ABOUT, YOU CAN BE SUBJECT TO PROSECUTION FOR MAKING A FALSE

6   STATEMENT OR PERJURY.

7           THE WITNESS:  RIGHT.

8           THE COURT:  OKAY.

9           THE WITNESS:  OKAY.

10          THE COURT:  GO AHEAD.

11                  DIRECT EXAMINATION

12  BY MR. CARLIN:

13  Q    MRS. SABLE, HOW LONG HAVE YOU BEEN MARRIED TO MR. SABLE?

14  A    36 YEARS.

15  Q    OKAY.  WHERE -- ARE YOU CURRENTLY RESIDING WITH MR.

16  SABLE?

17  A    YES.

18  Q    WHERE IS THAT, PLEASE?

19  A    727 YORKTOWN AVENUE IN HUNTINGTON BEACH.

20  Q    AND WERE YOU PRESENT WHEN MR. SABLE WAS ARRESTED?

21  A    YES.

22  Q    WAS THE ARREST EFFECTED AT THAT ADDRESS?

23  A    YES.

24  Q    OKAY.  AND I THINK I'VE ASKED YOU HOW LONG YOU'VE LIVED

25  THERE?

21

1    A    YES.

2    Q    OKAY.

3    A    AND IT'S APPROXIMATELY -- I THINK IT'S A LITTLE OVER TWO

4    YEARS NOW.

5    Q    OKAY.  NOW, LIKE ANY OTHER MARRIED COUPLE, HAVE YOU AND

6    MR. SABLE HAD PROBLEMS IN THE PAST?

7    A    YES.

8    Q    IS IT YOUR INTENTION AS YOU SIT HERE NOW TO CONTINUE

9    YOUR MARRIAGE WITH MR. SABLE, OR ARE YOU PLANNING AS YOU SIT

10    HERE NOW TO DIVORCE MR. SABLE?

11    A    WE'RE STAYING MARRIED.

12    Q    OKAY.  SINCE YOU'RE ON THE STAND, YOU'VE KNOWN MR. SABLE

13    HOW LONG BEYOND THE MARRIAGE?

14    A    37-1/2, 38 YEARS, SOMETHING LIKE THAT.

15    Q    BASED ON THAT 37-1/2 OR 38 YEARS, HIS PROBLEMS

16    NOTWITHSTANDING IN 2002, DO YOU HAVE AN OPINION AS TO WHETHER

17    OR NOT IF GRANTED BOND, MR. SABLE WOULD HONOR HIS OBLIGATIONS

18    AND SHOW UP IN MASSACHUSETTS?

19    A    HE ABSOLUTELY WILL BE THERE.

20            MR. CARLIN:  NO FURTHER QUESTIONS.

21            THE COURT:  ANY QUESTIONS.

22                    CROSS-EXAMINATION

23    BY MR. SAGEL:

24    Q    DO YOU KNOW YOUR HUSBAND'S PROBATION OFFICER IN THE

25    STATE CASE?

22

1    A    NO.

2    Q    HAVE YOU EVER SPOKEN TO HIS PROBATION OFFICER?

3    A    NO.

4    Q    YOU'VE NEVER --

5    A    NOT THAT I'M AWARE OF.

6    Q    YOU'VE NEVER BEEN INTERVIEWED BY A PROBATION OFFICER?

7    A    SOMEBODY CALLED ME FROM -- YESTERDAY, I THINK IT WAS.

8    I'M SORRY.  I HAVE HIS NAME WRITTEN DOWN.  I DON'T REMEMBER

9    HIS NAME.  GAUTIER MAYBE OR ANDRE.

10            THE COURT:  MR. --

11            THE WITNESS:  WHO?

12            THE COURT:  I THINK I KNOW WHO IT IS.  THE

13    GENTLEMAN SITTING OVER THERE.  I KNOW WHO IT IS.

14            THE WITNESS:  OKAY.  OTHER THAN THAT, I DON'T

15    RECALL EVER SPEAKING TO ANYBODY ELSE.

16    BY MR. SABLE:

17    Q    HAVE YOU BEEN SEPARATED IN THE LAST THREE YEARS FROM THE

18    DEFENDANT?

19    A    NO.  WE'VE ALWAYS LIVED TOGETHER.

20    Q    NEVER BEEN SEPARATED?

21    A    NO.

22    Q    NEVER TOLD ANYBODY YOU WERE SEPARATED?

23    A    WHEN WE WERE HAVING PROBLEMS, YES, I SAID I WISH WE WERE

24    SEPARATED.

25            AND ARE YOU MARRIED?  MAYBE --

23

1          THE COURT:  NO.  LET ME --

2          THE WITNESS:  OKAY.

3          THE COURT:  HE GETS TO ASK THE QUESTIONS.

4          THE WITNESS:  ALL RIGHT.  FINE.  WE HAVE NEVER BEEN

5    SEPARATED.

6          THE COURT:  ONE MINUTE.  ONE MINUTE.  ANSWER THE

7    QUESTIONS THAT ARE ASKED OF YOU.

8          THE WITNESS:  OKAY.

9          THE COURT:  NEXT QUESTION.

10   BY MR. SAGEL:

11   Q    HAVE YOU EVER BEEN SEPARATED IN THE LAST THREE YEARS?

12   A    NO.

13   Q    HAVE YOU EVER LIVED IN A SEPARATE RESIDENCE FROM THE

14   DEFENDANT IN THE LAST THREE YEARS?

15   A    NO.

16         MR. SAGEL:  NO FURTHER QUESTIONS, YOUR HONOR.

17         THE COURT:  OKAY.  YOU CAN STEP DOWN.

18         THE WITNESS:  THANK YOU.

19         THE COURT:  ANYTHING ELSE FROM ANYONE?

20         MR. SAGEL:  NOTHING FROM THE GOVERNMENT, YOUR

21   HONOR.

22         MR. CARLIN:  NO, YOUR HONOR.

23         THE COURT:  OKAY.  I'M GOING TO ORDER THAT MR.

24   SABLE BE DETAINED WITHOUT BOND PENDING FURTHER PROCEEDINGS.

25         MR. SABLE HAS OBVIOUSLY -- AT LEAST THE RECORD

24

1    INDICATES THAT THE CRIMINAL CONDUCT OF MR. SABLE HAS ONLY

2    TAKEN PLACE IN THE LAST TWO YEARS.  BUT IN LIGHT OF HIS

3    HISTORY ON PROBATION, WHAT I CAN ONLY DEEM TO BE AN UNSTABLE

4    RESIDENCE, A LACK OF PERSONAL BAIL RESOURCES, I BELIEVE THAT

5    THE GOVERNMENT HAS DEMONSTRATED A SERIOUS RISK OF FLIGHT.

6    AND THE COURT DOES NOT BELIEVE THERE ARE ANY CONDITIONS OR

7    COMBINATION OF CONDITIONS THAT WILL INSURE HIS APPEARANCE IN

8    COURT.

9         SO, HE'S GOING TO BE DETAINED BASED SOLELY ON THE

10   RISK OF FLIGHT.

11        AND I WILL SIGN A COMMITMENT ORDER TO HAVE HIM

12   RETURNED TO MASSACHUSETTS AS QUICKLY AS POSSIBLE.

13        THAT WILL BE ALL.

14        MR. SAGEL:  THANK YOU, YOUR HONOR.

15        (PROCEEDINGS CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT

TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


_____                    4/16/05
FEDERALLY CERTIFIED TRANSCRIBER            DATED
DOROTHY BABYKIN

*EXHIBIT 3*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                    04-10365-GAO

STEVEN P. SABLE

<u>AFFIDAVIT OF NANCY SABLE</u>

I, Nancy Sable, hereby state that:

1.     I have been married to Steven P. Sable since June 8, 1968.

2.     When Steven was arrested we were living together at 727 Yorktown Avenue, Huntington
       Beach, California.

2.     I currently reside at 17172 Bolsa Chica Street, Apartment 43, Huntington Beach,
       California. I moved to this address in January, 2005 and will, without reservations,
       permit my husband to live here with me.

3.     I am employed at Pacific Monarch Resorts/Vacation Marketing Group, 3611 S. Harbor
       Blouvard, Santa Ana, California as evening supervisor for the confirmations department.
       I have been working at this job since July, 2002.

4.     I also work at SlackTax, Inc., 10810 Warner Avenue, Fountain Valley, California in
       marketing and clerical work. I have been working at this job since August, 2003.

5.     I understand that my husband now requires dialysis treatment three times per week, and
       have learned that a Gambro dialysis facility is located near to our residence.

Signed under the pains and penalties of perjury this day 4th of May, 2005.

Nancy Sable



U.S. Department of Justice

**United States Marshals Service**

*District of Massachusetts*

*John Joseph Moakley*
*United States Courthouse*
*1 Courthouse Way, Suite #1-500*
*Boston, Massachusetts 02210*

**To:** Chief William Fallon

**From:** SDUSM Jeffrey Bohn

**cc:** Deputy Superintendent, Brian H. Gillen, PCCF

**Date:** April 29, 2005

**Re:** Steven Sable

Steven Sable is a federal inmate being held in pre trial detention at the Plymouth County Correctional Facility (PCCF). Mr. Sable has been arrested on charges of mail fraud and has been housed at PCCF since 01/12/2005.

Mr. Stable has been diagnosed with a serious medical condition known as end-stage renal disease (ESRD). This disease causes a complete or near complete failure of the kidneys to function and excrete wastes. ESRD occurs when the kidneys are no longer able to function at a level that is necessary for day to day life. In a person with ESRD, the kidney function is so low that without dialysis or kidney transplantation, complications are multiple and severe, and death will occur from accumulation of fluids and waste products in the body.

In early March 2005, the United States Marshals Service received a request from PCCF to transfer Mr. Sable to a Bureau of Prisons (BOP) medical facility. PCCF said that Mr. Sable had been diagnosed with end stage renal disease and was in need of dialysis three times a week, each treatment lasting four hours. PCCF went on to say that Mr. Sable's physical condition and treatment schedule was causing a drain on medical staff and the transportation unit.

SDUSM Bohn contacted AUSA Jack Pirozzolo in an attempt to secure a court order directing the BOP to designate Mr. Sable to a federal facility that could better handle Mr. Sable's medical problems. SDUSM Bohn explained to AUSA Pirozzolo the proper procedures the USMS needed to follow in order to request designation of an inmate to a BOP medical facility. In the following weeks these procedures were not followed and the USMS did not receive a court order. Mr. Pirozzolo contacted the BOP legal center at FMC Devens who responded with the same procedures previously explained by SDUSM Bohn.

SDUSM Bohn also contacted Mr. Sable's attorney, Elliot Weinstein in hopes of obtaining a court order to transfer Mr. Sable to a BOP medical facility. Weinstein produced a "motion to transfer" on 04/04/2005. Unfortunately, this motion was subsequently objected to by AUSA Pirozzolo and again, the process to transfer Mr. Sable was put on hold.

On 04/13/2005, PCCF Deputy Superintendent, Brian Gillen, sent a letter further detailing Mr. Sables treatments and reasons for transfer. At this time SDUSM Bohn met with Judge Joyce London Alexander

1

and informed her of the ongoing issues.  Judge Alexander said that she would contact the attorney's and discuss the issues.

On 04/14/2005, after speaking with both attorneys, Judge Alexander issued an electronic order denying the defendants request for release. The USMS received this electronic filing on 04/27/2005  The filing notes that "the court has received no medical evidence, directly, that the defendants medical needs are not being satisfactorily cared for by the Plymouth County Correctional Facility."  The electronic filing does not directly order or request Mr. Sable's transfer to a BOP medical facility and thus can not be forwarded to the BOP to begin Mr. Sable's transfer.  Mr. Sable will not be considered for transfer without a signed court order.

The process to transfer a federal pre-trial inmate to a Bureau of Prisons medical facility can sometimes take up to three weeks.  A federal inmate requiring dialysis treatment can take even longer due to the shortage of dialysis beds in their facilities.  Because of this, it is imperative that proper procedures be followed by all parties involved in the transfer process. The process to obtain this order was uncharacteristically objected to by the United States Attorney's office causing significant delays.

A United States Marshals policy directive states that "prisoners requiring dialysis are a heavy security and manpower burden on the districts."  Mr. Sable's medical needs have created a huge burden on the staff at the Plymouth County Correctional Facility and the United States Marshals Service.  All parties do agree that Mr. Sable is being properly cared for while at the outpatient treatment facility, however, Mr. Sable's medical condition, while in custody, could best be monitored at a Bureau of Prisons medical facility. A BOP medical facility would also be the most practical financial solution.  The additional cost to house Mr. Sable while held in pre-trial detention is adding up quickly.  These additional expenses include: special housing in the PCCF medical unit costing $1340.00 per week and transportation to dialysis at $600.00 per week.  In addition, Mr. Sable's initial three day hospital stay totaled over $6200.00.  The gross additional cost to keep Mr. Sable in custody has totaled over $15,000.00 and Mr. Sable is scheduled for additional surgeries in the near future.

The United States Marshals office has made every attempt to ensure that Mr. Sable is treated with the highest, most practical, level of medical care.  Multiple discussions with AUSA Pirozollo and Mr. Weinstein have resulted in no progress being made to resolve the medical concerns and financial issues faced by the United States Marshals Service.  The United States Marshals Service will continue to work with all parties to come to a suitable solution.

● Page 2