UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                       ) | CRIMINAL NO. 04-10365-GAO |
| ) | |
| STEVEN SABLE             ) | |

<u>MOTION FOR FUNDS FOR TRANSPORTATION</u>

Defendant, Steven Sable, respectfully moves, pursuant to 18 U.S.C. § 4282, that this court order the U.S. Marshal Service to provide defendant with a plane ticket from Boston, Massachusetts to Long Beach, California upon his release from custody.

Section 4282 provides, in pertinent part:

> On the release from custody of a person arrested on a charge of violating any law of the United States . . . [and] indicted . . . but not convicted, and detained pursuant to chapter 207 . . . the court in its discretion may direct the United States marshal for the district wherein he is released, pursuant to regulations promulgated b y the Attorney General, to furnish the person so released with transportation and subsistence to the place of his arrest, or, at his election, to the place of his bona fide residence if such cost is not greater than to the place of arrest.

Although the statute does not require a showing of indigency, Mr. Sable has been found to be indigent. In addition, his medical condition warrants expeditious transportation back to California.

A proposed order is attached hereto.

    STEVEN SABLE
    By his attorney,

    /s/ Miriam Conrad

    Miriam Conrad
      B.B.O. # 550223
    Federal Defender Office
    408 Atlantic Avenue, 3rd Floor
    Boston, MA  02110
    Tel:  617-223-8061

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
UNITED STATES                 )
                              )
       v.                     )     CRIM NO. 04-10365-GAO
                              )
STEVEN SABLE                  )
                              )
_____)

**ORDER ON DEFENDANT'S MOTION FOR RELEASE**

SOROKIN, U.S.M.J.                                    NOVEMBER 16, 2005

Defendant moves for release claiming he now qualifies under 18 U.S.C. § 3142.  The Motion is ALLOWED and STAYED.  The terms of the Release Order and the Stay are set forth below.

PROCEDURAL STATUS

While Judge O'Toole considered and rejected Sable's request for release on June 9, 2005, the Court now has the benefit of additional material information that was unavailable back in June.  First, in October Pretrial Services made a personal visit to Mrs. Sable's home, spoke with her regarding the issues surrounding Sable's request for release, interviewed one of her employers and reviewed her pay stubs from her second job.  Second, the degree of careful monitoring required by Sable's medical condition and the substantial consequences to Sable of a problem has become evident in light of Sable's two infections necessitating his removal from Plymouth to Jordan Hospital.  Both of these infections occurred after Judge O'Toole issued his Order.  Third, the Court has before it a more complete and restrictive set of conditions than

1

proposed previously.

In light of this new information, the Court treats Sable's Motion as a request to consider his release anew under § 3142. Accordingly, I have reviewed all of the relevant facts and law in reaching my decision.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW

1. Sable's Personal Background

Sable is a 57 year old United States citizen born in New York. He is a high school graduate with some college credits. He served in the United States Navy for approximately one year before receiving a discharge due to injury. Thirty seven years ago he married Nancy Sable. Together they have one child, a twenty-seven year old daughter living in California.

For many years of his adult life Sable worked in Massachusetts and New York. From 1981 until 2000 he resided either in Massachusetts or New York. At some point in approximately 2000 or 2001 he moved to California with his wife. He resided in California until his arrest on the pending charges in December 2004.

At the time of his arrest Sable suffered from diabetes as well as heart and vision problems. He reported no prior use of or experimentation with illegal substances and no current use of alcohol. He has no mental health history. In addition, Sable reported no income or assets.

According to Pretrial Services, Sable's criminal record consisted of two offenses from California occurring in 2002 to 2004. On June 19, 2002, Sable was arraigned in California state court on charges of Grand Theft Auto and Insufficient Funds: Checks/Etc. On July 3, 2002, he received a felony conviction for these charges; the court imposed a 90 day suspended jail sentence as well as a three year period of probation with a requirement of restitution. At some

point Sable absconded. Eleven months later he was arrested. Subsequently, the Court revoked Sable's probation both for failure to report to his probation officer and a new criminal charge – Grand Theft: Money/Labor/Property over $400. This offense appears to have involved Sable staying at a motel for a number of days or an extended period of time and then leaving without paying. Ultimately, Sable, after a thirty day jail sentence,[1] was placed back on Probation under the supervision of the California courts.

Approximately six months later, on December 14, 2004, Sable was arrested on the present charges. The record indicates that during this second period of probation Sable was in compliance with his conditions of his probation, except he did not make any restitution payments. The amount of his income, if any, during this period is unclear.

At the time of his federal arrest, Sable was living in a motel in California; his wife was also living in a motel. They had been living in motels in California for a substantial period of time.

    2.    Mrs. Sable's Present Living Situation

Beginning on January 28, 2005 Mrs. Sable moved to an apartment in Huntington Beach, California where she has resided since that time. Pretrial Services in California visited the dwelling on October 13, 2005 and found it to be a clean one bedroom apartment.

Mrs. Sable works two jobs Monday through Saturday. During the day she is employed by Slack Tax Inc and in the evening by Pacific Monarchs Resorts. Her combined income is $40,000 per year. Mrs. Sable receives health insurance through work; she is willing to add her husband to

---

[1] Sable's state court Probation Officer reported the 30 day jail sentence though the criminal record report suggests a somewhat longer period in jail.

the Blue Shield plan she has and has located a nearby Health Care Center that can accommodate his medical needs.

Regarding her husband's release, Mrs. Sable has offered to pay for a plane ticket to California if the Court releases Sable. In addition, Mrs. Sable understands the mechanics of electronic monitoring as explained by Pretrial Services and indicated her consent to such a condition if imposed. Pretrial Services has also interviewed the Sables' adult daughter for confirmation of the personal history information provided by Mrs. Sable. Finally, Mrs. Sable has no criminal record.

At the request of the Court, Pretrial Services spoke with Mrs. Sable's employer Mrs. Judee Slack, President of Slack Tax, Inc. Mrs. Slack reported that she has employed Mrs. Sable as an Administrative Assistant since 2003. She described Mrs. Sable in "glowing terms" as a dedicated employee who works 20 hours per week. Because Mrs. Sable requested that Pretrial not contact her other employer, Pretrial reviewed numerous pay stubs from this job confirming her work.

3. The Indictment

The Indictment alleges thirty seven violations of Title 18 §§ 1341 (mail fraud), 1343 (wire Fraud), 78j(b) & 77ff (Securities Fraud), 1957 (Monetary Transactions in Property Derived from Specified Unlawful Activity), 981 and 982 (Forfeiture) and aiding and abetting the same under § 2. Essentially, the Indictment alleges that during at least the period June 1999 through April 2002 Sable engaged in a fraudulent stock promotion scheme in which he sold $800,000 worth of "units" of a company based upon false and fraudulent statements about the company and its business.

According to the Indictment, Sable persuaded various individuals to buy stock in this company that he owned or controlled on the false and fraudulent misrepresentation that the company was on the verge of selling a valuable technology controlled by the company when in fact no such sale was imminent. Moreover, the Indictment alleges that before the sales alleged in the Indictment, the owner of the technology had revoked, in writing, any right Sable's company had to own or market the technology. Sable is alleged to have used the money received from the investors to fund a lavish personal lifestyle.

On December 14, 2004, Sable was arrested on the Indictment at home in California.

4. Sable's Detention and Medical Problems at Plymouth

After his arrest, the District Court in California detained Sable. He arrived at the Plymouth County House of Correction on January 12, 2005 reporting diabetes, shortness of breath, high blood pressure, heart pain, heart pounding, arthritis, kidney trouble, frequent or painful urination, and dizziness or fainting spells. On February 7, 2005, a blood test established his creatinine serum level at 2.7 which appears to be a level indicating chronic renal failure. Apparently no medical follow up occurred in response to this test result. On March 18, 2005, Plymouth staff found Sable unconscious in his cell. He was sent to Jordan Hospital where, with a creatinine serum level at 9.6 he was diagnosed with end stage renal disease. Sable now requires dialysis three times per week. Without such dialysis for a period of seven days he will die.

In April Sable requested release because he required dialysis. Magistrate-Judge Alexander denied that request. Upon review, Judge O'Toole also denied the motion to revoke the order of detention, but ordered Sable transferred to an appropriate federal medical facility.

5

That Order entered on June 9, 2005.

Subsequent to Judge O'Toole's transfer order, Sable has developed a number of infections at the site of the chest catheter. Twice he has required hospitalization for these infections. At least one of the hospitalizations was sufficiently serious to require a seven day stay at Jordan Hospital. These infections developed because the preferred method of cleaning for dialysis patients with a chest catheter is a sponge bath, an option that was not apparently available to Sable. Fortunately, Sable's doctor found a different way to administer the dialysis so that this particular problem appears resolved.

Unfortunately, not all of the medical treatment problems at Plymouth have been resolved. The Jordan Hospital medical records indicate that the medical staff has had difficulty adjusting or changing Sable's medication due to a lack of responsiveness from Plymouth personnel. For example on August 4, 2005 Jordan Hospital discharged Sable with a prescription for an antibiotic to treat an infection that had placed Sable in critical care as recently as the day before, however, the medical staff encountered substantial difficulty in arranging for Sable's medication to continue without interruption upon his return to Plymouth. The Government, after discussions with Plymouth, has informed the Court that Plymouth has acknowledged there is often a delay in changes to medications, but the problem is "being rectified." Plymouth also has acknowledged a problem in on going monitoring of Sable's medical condition notwithstanding requests for such monitoring from the physician at Jordan Hospital treating him.

5. The Transfer to a BOP Facility

Since Judge O'Toole's Order, Sable has remained on the waiting list for a dialysis bed in a BOP facility. While a few openings have arisen, they have been filled by persons with more

6

serious conditions than Sable or persons with a longer period on the waiting list. At the Court's request, the Marshals and the BOP reviewed Sable's present medical condition and position on the waiting list. They determined that he was placed in the appropriate spot on the waiting list.

A representative of the Bureau of Prisons came to the detention hearing on October 6, 2005, to explain when Sable might move to a BOP facility. The BOP representative stated that sixty new dialysis beds have been installed at their Ft. Devens facility; he further indicated that BOP's medical staffing contractor had to hire staff to care for the new inmate-patients. He estimated that would take 60 to 120 days at which time BOP would accept sixty new dialysis patients at Devens. Sable will receive one of these sixty beds because he occupies the number 17 slot on the BOP waiting list. At a further hearing held on this matter on November 8, 2005, the government, for BOP, indicated that BOP had completed the staffing arrangements for the dialysis beds, however, the new beds require some further electrical and/or plumbing work. BOP anticipates this work should be completed on December 11, 2005, but, in view of potential holiday delays suggested that a mid-January completion date is more realistic.

      6. Sable's Request for Release.

In this case, none of the statutory presumptions favoring detention under § 3142 apply. The defendant may be detained only if the Government establishes, by a preponderance of evidence, that he poses a risk of flight. 18 U.S.C. § 3142; <u>United States v. Salerno</u>, 481 U.S. 739 (1987); <u>United States v. Patriarca</u>, 948 F.2d 789 (1st Cir. 1991). If, however, the Court can establish conditions that "reasonably assure the appearance of [Sable] as required" then the statute mandates release. 18 U.S.C. § 3142(c). In making the foregoing determination, the statute directs the Court to consider:

(1) the nature and circumstances of the offense charges, including whether the offense is a crime of violence, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

   (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law;

(4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).

At the outset, I note that the problems with Sable's medical treatment at Plymouth are of concern. I do not view these facts in and of themselves as justifying release; Sable must qualify for release under the statute.

The parties have invested substantial effort in disputing two issues: (1) whether Plymouth moved Sable into a room containing medical waste formerly occupied by an inmate with tuberculosis and (2) whether Sable and/or his wife accurately reported whether or not they separated at some point during their relationship. To the Court neither issue seems particularly material to the question of release.

As to the former issue, the video CD submitted by the government and the documents the defendant submitted established that his new room was cleaned the day he moved in, but after he

8

moved in, as his counsel asserted to the Court. The evidence also establishes that while moving from one room to another he passed the inmate with tuberculosis in the hallway (who also moved that day apparently to the room in the medical unit Sable vacated). Officials from Plymouth have informed the Court that the inmate with tuberculosis was not the occupant of the room to which Sable moved. On this record, these facts neither establish that Plymouth exposed defendant to tuberculosis by moving him into an infected room (as defendant argued) nor a knowing misrepresentation of the same by Sable (as the government argued). Sable apparently drew an understandable, but erroneous conclusion from the available facts.

As to the second issue, the parties have submitted numerous statements and/or reports of statements made by either Sable or his wife at various times regarding whether or not they ever separated. The government presses this issue to establish Mrs. Sable's lack of suitability as a third party custodian. Whatever the resolution of the dispute, I find something other than the defendant's wife as a third party custodian is required in this case in light of both Sable's history on probation and the nature of the facts underlying the charges.

I do find that Mrs. Sable is a hard working citizen of the United States who has no criminal record. She has acknowledged that she and her husband during their thirty seven year marriage have had martial problems. She also has unequivocally and repeatedly stated her willingness to help her husband by providing him a home and health insurance. In short, she has offered and Pretrial has carefully verified that she can provide Sable with a stable appropriate living environment meeting his various needs. I also find, in light of the thirty seven year relationship between Sable and his wife as well as her letter to the Court submitted by Sable and her interview by Pretrial that Sable and his wife are committed to each other. As to the foregoing

9

findings, I do not find that the separation issue, whatever its resolution, has any bearing.

The Indictment lays out in substantial detail a serious fraud offense involving at least $800,000. If convicted, the Sentencing Guidelines would recommend the imposition of a meaningful period of incarceration. Based upon the Indictment, the evidence appears reasonably strong.

While on Probation in California, Sable disappeared for a period of eleven months during which time he committed another criminal felony offense. That is troubling conduct of substantial significance to the release issue.

Defendant's regular dialysis regime does provide some of the stability and assurance required by the statute. Sable has a compelling medical requirement to appear at thrice weekly appointments for his dialysis; a failure to appear for these appointments, even for a brief period, would result in his death. Dialysis also provides another type of assurance regarding risk of flight, flight poses substantially greater risks to Sable and the continuity of care he requires necessitates a stable living arrangement.

Sable is sick. Indeed, he is materially sicker than he was when he appeared before the Magistrate-Judge in California. Even as to the past couple of months that have passed since his appearance before Judge O'Toole, he has had several serious medical problems requiring hospitalization. These hospitalizations bear on the question of release because they have removed any doubt both that Sable suffers from a serious medical condition requiring careful treatment on pain of serious medical consequences and that he knows it.

After consultation with the Government and Pretrial Services,[2] Sable proposes that the Court impose the following conditions on Sable's release: confine Sable to his wife's apartment, enforced by electronic monitoring, except for medication treatment (and employment provided Pretrial approves the employment); require Sable to submit a monthly financial statement of the type used to monitor defendants on probation or supervised release; and prohibit Sable from making any purchase or engaging in any financial transaction, apart from necessary medical expenses, in an amount exceeding $200 without prior approval of Pretrial Services; confining Sable's travel to the region of California in which he lives and Massachusetts.[3]

In light of all of the foregoing facts and conditions, I find that Sable qualifies for release under the statute in that the conditions reasonably assure his appearance as required and the safety of the community. Several factors lead me to this conclusion.

Sable's infections and hospitalizations since Judge O'Toole's Order establish the delicate treatment and care Sable's condition requires. I believe this is an important fact promoting Sable's compliance with his release conditions. Proper treatment will require a stable home life and regular visits to a regular doctor thereby providing the type of assurance more typically arising from employment or other more traditional community ties. Moreover, misconduct on

---

[2] Except as otherwise noted, the Government, while opposing release, agrees that if Sable is released the conditions proposed are the appropriate conditions.

[3] The parties agree on confining Sable's travel to the region of California in which he lives but disagree on whether the Court should define the region as the judicial district or Sable's county of residence and the contiguous counties. Because the Court is unfamiliar with the layout of the counties in Southern California and the boundaries of the judicial district, unlike the District of Massachusetts, are not obvious, Sable is restricted to Los Angeles and Orange counties. If Sable has medical appointments elsewhere in the judicial district or a different neighboring county Pretrial may authorize such travel.

release will lead to Sable's revocation and land him back at Plymouth at the bottom of the Bureau of Prison's dialysis waiting list. No doubt that is also a strong incentive to appear and to comply with his conditions.

The restrictive conditions imposed on Sable's release also tip the balance in favor of release. He will be quite restricted in his movements and financial activities as well as quite closely monitored by Pretrial Services in both respects. These are substantial facts weighing in favor of release.

Mrs. Sable has a stable appropriate home in which she has lived for approximately ten months and stable verified employment providing her with health insurance. Sable cannot readily move without the benefit of her health insurance and her health insurance is tied to her employment. This further ties Sable to the community, albeit in California, and helps assure his appearance.

Finally, Sable has proposed a release plan that addresses his need to come to Massachusetts for court appearances. The dialysis provider from whom he will receive his treatment has facilities in the Boston area so that when he comes here he can continue his treatment.

## RELEASE ORDER

The Court hereby ORDERS Sable's release on the conditions set forth below.

1. Pretrial Services' standard release conditions.

2. Electronic Monitoring confining Sable to his wife's home except for medical appointments, court appearances (and the related travel pre-approved by Pretrial Services), and meetings with counsel (subject to the same pre-approval requirement).

3. Sable must submit a monthly financial statement of the type used to monitor defendants on probation or supervised release by the seventh day of each month for the preceding month (e.g. February 7 for the January report), unless Pretrial establishes a different reporting date.

4. Sable may not purchase anything or engage in any financial transaction, apart from necessary medical expenses, in an amount exceeding $200 without prior approval of Pretrial Services.

5. Sable's travel is restricted to Los Angeles County, Orange County and such places as necessary for travel to Massachusetts for court appearances or meetings with counsel. All travel must be pre-approved by Pretrial Services.

6. Sable must notify Pretrial of the location of the dialysis center he uses within a week of his release. He must notify Pretrial, in advance, if he changes the center he uses.

7. Sable shall seek gainful employment not involving marketing or securities and shall propose such potential employment to Pretrial Services for approval. Pretrial may approve Sable leaving his home for the purposes of a verified job interview.

8. Sable and his wife must sign an unsecured appearance bond in the amount of $50,000. Mrs. Sable may sign that bond at the Central District of California.

9. Sable must provide Pretrial Services both in Boston and the Central District of California, in advance of his actual release, of the details of his arrangements for traveling to his wife's home upon his release. In addition, he must contact Pretrial Services in California within twenty-four hours of his arrival in California.

STAY

The Government has requested that, in the event of a release order, that I stay the Order for a week so that it may consider an appeal. This request is granted. Accordingly, this Order is STAYED until November 23, 2005.

If the Government does not notify the Court of an intent to appeal then both counsel should arrange a release hearing with the clerk and defense counsel should arrange for Sable's transportation to his wife's home in California thereafter.

If the Government notifies the Court that it intends to appeal, the Government has requested that I then stay my Order pending Judge O'Toole's decision on the appeal. Defendant opposes an open ended stay. I will continue the stay until November 30, 2005 so that the Government has sufficient time to prepare its appeal papers and to seek a further stay from Judge O'Toole as he deems appropriate. I deny without prejudice the request for an open ended stay as I believe that is a matter more appropriately ruled upon by Judge O'Toole.

CONCLUSION

WHEREFORE, the Court ALLOWS defendant's Motion for Release and STAYS this Release Order.

/s/ Leo T. Sorokin
LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE